COMMITTEE ON PROFESSIONAL ETH-ICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Complainant,

v.

Dennis D. PETERSON, Respondent.

No. 94–1068.

Supreme Court of Iowa.

Nov. 23, 1994.

John P. Messina, Des Moines, for complainant.

Dennis D. Peterson, pro se.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, LAVORATO, and SNELL, JJ.

McGIVERIN, Chief Justice.

The main question here is what action is appropriate upon our de novo review of the report of our Grievance Commission in this attorney disciplinary proceeding involving respondent Dennis D. Peterson. We revoke respondent's license to practice law in Iowa.

I. *Background facts and proceedings.* Dennis D. Peterson has at various times been licensed to practice law in our courts and has maintained a law practice in Forest City.

Beginning in the early 1980s and continuing until the early 1990s, Peterson seriously mishandled several of his clients' affairs. We briefly discuss each incident.

A. *David J. Rezac.* In the early 1980s, David J. Rezac retained Peterson for the purpose of filing a federal lawsuit with respect to a 1981 crop loss Rezac had sustained. Over the course of the next several years, Peterson falsely and repeatedly assured Rezac that suit had been filed, that court dates had been set and then rescheduled, and that the matter would be coming to trial. Peterson even scheduled meetings on at least two occasions with Rezac to prepare him for his testimony at the allegedly impending trial.

Later, in the summer of 1991, Rezac learned that Peterson had never filed suit in the matter. As a result of Peterson's failure to file suit and his misrepresentations to Rezac, the statute of limitations ran on Rezac's claim.

B. *Geneva and Thelford Brekke.* As counsel for both the estate of Thelford Brekke's spouse, Geneva Brekke, and later for the estate of Thelford Brekke, Peterson acted unprofessionally and received unauthorized fees.

1. In approximately July 1988, Thelford Brekke retained Peterson to handle the estate of his decedent spouse, Geneva Brekke. On two separate occasions, Peterson requested and received fees regarding Geneva Brekke's estate which had not been authorized.

First, in November 1988, Peterson requested and received from Brekke $2189 for

what Peterson described to Thelford Brekke as "estate fees." However, Peterson had neither sought nor received prior court authorization for probate fees at the time Brekke made the $2189 payment.

Second, on May 14, 1991, Peterson filed applications for attorney fees and executor fees with respect to the Geneva Brekke estate. Each was approved by the court in the amount of $1850. The executor, however, had not requested fees and never received them.

Furthermore, Peterson failed to timely close the Geneva Brekke estate.

2. Following his mishandling of the estate of Geneva Brekke, Peterson became counsel for the estate of Thelford Brekke. Once again, Peterson accepted funds without court authorization. Specifically, on July 20, 1989, Peterson received and cashed a check in the amount of $4156 from the executor of Thelford Brekke's estate. Peterson's acceptance of the check was without prior or subsequent court authorization.

Moreover, Peterson failed to complete all of the necessary work on the Thelford Brekke estate.

C. *Tom and Nancy Reuter.* In 1988, Tom and Nancy Reuter employed Peterson to handle their medical malpractice case. Peterson filed suit in the matter in October 1988. On a motion for summary judgment, the Reuters' suit was dismissed in January 1990. Peterson failed to advise the Reuters of this dismissal of their suit and falsely told them that the matter was set for trial in September 1992.

D. *Stella Demo.* In March 1991, Stella Demo consulted Peterson about representing her in an uncontested dissolution of marriage action and, in September 1991, she gave Peterson a $500 retainer. Although the Demo dissolution was obtained without contest in January 1992, Peterson did not advise Demo until February 24, 1992, after Demo had made repeated inquiries, that the fee for his services was $250 and that a check for the balance of the retained funds would be sent to her right away. Demo never received the unearned balance of the retainer.

E. *Ralph and Pat Thiner.* In December 1988, Ralph and Pat Thiner hired Peterson to file corporate and personal bankruptcy petitions on their behalf. The Thiners gave Peterson a $5000 cash retainer. Although Peterson told the Thiners that he had filed the bankruptcy petitions, he did not actually do so. Peterson's neglect resulted in a foreclosure action against the Thiners' business, which the Thiners were able to stop only by hiring new counsel. Despite repeated requests from the Thiners, Peterson failed to give an accounting for the Thiners' $5000 cash retainer and to refund any portion of it to them.

F. *Troy Julius.* On May 9, 1992, Troy Julius gave Peterson $3600 in cash to invest on Julius' behalf after Peterson had falsely advised Julius that Peterson was a "licensed broker." Peterson subsequently advised Julius that the money had been invested in a six-month mutual fund that would mature in October 1992. However, Peterson had misappropriated all of Julius' money for his personal use. In December 1992, Peterson sent Julius a letter offering him various items of personal property in compensation for Peterson's wrongful taking of Julius' money.

With respect to each of the aforementioned client's matters, the Committee on Professional Ethics and Conduct of the Iowa State Bar Association (Committee) sent Peterson, by restricted certified mail, and/or personally served Peterson with a notice of complaint. Although Peterson ultimately accepted each notice, he failed to reply to any of them. Accordingly, in each instance, the Committee sent Peterson, by restricted certified mail, a notice of the need to respond as required by the Ethics and Conduct Rule 3.3. Peterson again did not respond.

Based on Peterson's mishandling of the aforementioned clients' matters and his failure to respond to the Committee's notices regarding such matters, the Committee filed a complaint against Peterson alleging violations of various provisions of the Iowa Code of Professional Responsibility for Lawyers (Code). He did not answer the complaint, respond to a request for admissions served by the Committee, nor appear at the Grievance Commission's hearing on this matter

even though he received proper notice. The Grievance Commission filed its findings of fact, conclusions of law, and recommendation of an indefinite suspension of Peterson's license. Peterson did not appeal.

II. *Proof burden and scope of review.* The Committee has the burden of proof to establish by a convincing preponderance of the evidence that respondent has violated the Code as charged. *Committee on Professional Ethics & Conduct v. Zimmerman,* 465 N.W.2d 288, 290 (Iowa 1991).

When an attorney fails to appeal the Grievance Commission's recommendation, we review de novo the record made before the Grievance Commission and decide the matter. Iowa Sup.Ct.R. 118.10; *Committee on Professional Ethics & Conduct v. Shepler,* 519 N.W.2d 92, 93 (Iowa 1994).

Pursuant to Iowa supreme court rule 118.10, we determine the appropriate discipline.

III. *Violations of the Code.* The Grievance Commission found and concluded that Peterson's behavior towards his aforementioned clients and the Committee resulted in repeated violations of the Code as follows.

The Grievance Commission concluded that Peterson's conduct in handling Rezac's case, including failing to file suit and repeatedly lying to cover-up such failure to file suit, and in failing to respond to the Committee's notices violated DR 1–102(A)(1), (4), (5), and (6) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation or conduct prejudicing the administration of justice or any other conduct adversely reflecting on the attorney's fitness to practice law); DR 6–101(A)(3) (prohibiting neglect of a legal matter entrusted to the attorney); and DR 7–101(A)(2) and (3) (prohibiting intentionally failing to carry out a contract of employment entered into with a client for professional services and prejudicing or damaging a client during the course of the professional relationship).

The Grievance Commission concluded that Peterson's conduct in handling Geneva Brekke's estate and in failing to respond to the Committee's notices also violated DR 1–102(A)(1), (4), (5) and (6); and DR 6–

101(A)(3). In addition, the Grievance Commission found that Peterson violated DR 1–102(A)(3) (prohibiting illegal conduct involving moral turpitude); and DR 2–106(A) (prohibiting charging or collecting an illegal or clearly excessive fee). The Grievance Commission further concluded that Peterson's handling of Thelford Brekke's estate and failing to respond to Committee notices likewise violated the same aforementioned provisions of the Code which Peterson violated in mishandling Geneva Brekke's estate.

With respect to Peterson's conduct regarding Tom and Nancy Reuter's case and failure to respond to notices sent by the Committee, the Grievance Commission concluded that Peterson violated DR 1–102(A)(1), (4), (5) and (6); and DR 6–101(A)(3).

Similarly, the Grievance Commission found that Peterson violated DR 1–102(A)(1), (4), (5), and (6); and in addition violated DR 1–102(A)(3); and DR 9–102(B)(4) (requiring prompt payment or delivery to the client as requested by the client the funds in the possession of the lawyer which the client is entitled to receive), in his handling of Stella Demo's funds given to him as a retainer and in his failing to respond to Committee notices.

Once again, the Commission found Peterson to be in violation of DR 1–102(A)(1), (3), (4), (5), and (6); and DR 9–102(B)(4) due to his mishandling of Ralph and Pat Thiner's bankruptcy affairs and their funds, and his continuing failure to respond to notices sent by the Committee. In addition, the Grievance Commission found that Peterson violated DR 6–101(A)(3) regarding the same matter.

Finally, the Grievance Commission concluded that Peterson violated DR 1–102(A)(1), (3), (4), (5), and (6) for his actions towards Troy Julius, misappropriation of Julius' funds, and failure to respond to Committee notices.

Upon our review of the record, we agree with the Grievance Commission's findings and conclusions regarding Peterson's violations of the Code.

IV. *Imposition of discipline.* In deciding the discipline we should impose upon Peter-

son, we consider, as did the Grievance Commission, prior disciplinary action we have taken against Peterson. *See Zimmerman,* 465 N.W.2d at 293 ("We have repeatedly held that prior disciplinary action bears on the decision in a subsequent case against the same lawyer." (citations omitted)).

We had suspended Peterson's license in 1991 with no possibility of reinstatement for three months for neglect of five other estates and one guardianship and conservatorship, and for failure to reply to the Committee's inquiries and discovery requests. *Committee on Professional Ethics & Conduct v. Peterson,* 471 N.W.2d 787, 788 (Iowa 1991). He was later reinstated.

In late 1992 or early 1993, Peterson abandoned his Forest City law practice and moved to Arizona. On November 19, 1993, we indefinitely suspended Peterson's license to practice law in this state due to failure to comply with Iowa supreme court rule 121 (regarding client security) and rule 123 (regarding continuing legal education). He remains under suspension for these violations.

We also note that a failure to respond to inquiry from the Committee is, in and of itself, misconduct. *Committee on Professional Ethics & Conduct v. Stienstra,* 390 N.W.2d 135, 137 (Iowa 1986).

In light of Peterson's numerous violations of the Code, his repeated failure to respond to the Committee's inquiries, and his previous record, we revoke Peterson's license to practice law in the courts of this state, as that term is defined in Iowa supreme court rule 118.12.

Costs shall be taxed to respondent pursuant to Iowa supreme court rule 118.22.

**LICENSE REVOKED.**