**IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS AND CONDUCT, Complainant,**

v.

**Robert L. SIKMA, Respondent.**

**No. 95–339.**

Supreme Court of Iowa.

June 21, 1995.

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for complainant.

N. Richard Willia, Gildemeister, Willia & Keane, Sioux City, for respondent.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, LAVORATO, and NEUMAN, JJ.

McGIVERIN, Chief Justice.

This attorney disciplinary proceeding involves the conduct of attorney Robert L. Sikma in his handling of his business relationship with a client, Rashelle Katseres. The Grievance Commission found Sikma violated two disciplinary rules and recommended a three month suspension of his license to practice law. Based upon our de novo review of the record, we agree with the Commission's conclusions and substantially adopt its recommended discipline.

I. *Background facts and proceedings.* Respondent Robert L. Sikma is an attorney licensed to practice law in the state of Iowa and has been engaged in a private general practice in Sioux City since 1978. Sometime around 1987, Sikma became acquainted with Rashelle Katseres. This disciplinary pro-

ceeding arises from Sikma's ensuing professional and business relationships with Katseres.

A. *Factual summary.* A few years after their acquaintance, Katseres retained Sikma to draft a will for her and to evaluate a possible workers' compensation claim regarding the death of her husband in 1988. In February 1990, Sikma prepared the will which Katseres had requested and which specifically mentioned disposition of $120,000 in treasury bonds. Also, in the spring of 1991, Sikma filed a federal workers' compensation claim for Katseres. As of October 1991, the workers' compensation matter had not yet been resolved.

In June 1991, an alleged entrepreneur in the telemarketing industry, Andrew Armstrong, sought out Sikma regarding Armstrong's efforts to establish Morningstar Communications (Morningstar) as a going business concern in the Sioux City area. Armstrong was the president, secretary, and treasurer of Morningstar and offered to make Sikma chairman and chief executive officer (CEO) of the organization. Sikma had some previous experience in this type of business from his own prior investments and was quite interested in Armstrong's proposal. After contacting the three references Armstrong had provided, Sikma accepted Armstrong's offer and received a signing bonus of $2,000. Sikma was also paid a salary of $1,000 every two weeks for about two hours of work each day. Sikma hoped to increasingly devote more time to Morningstar and to receive a better salary and stock in the company as it became more financially sound. Eventually, he hoped the success of the company would enable him to retire from the practice of law.

As chairman and CEO, Sikma's duties included drafting, reviewing, and negotiating contracts with companies hiring Morningstar. Once Morningstar began negotiating with companies already familiar with its telemarketing services, Sikma did less of the company's contract work and began seeking prospective customers and investors.

In addition to his work at Morningstar, Sikma maintained his legal practice. His

legal work in the summer of 1991 included continued representation of Katseres in her workers' compensation case, although Katseres had also hired another attorney, Andrew Orr, to prepare a new will and to represent her in an unrelated contract dispute.

Sikma's legal work also included representation of Michael Hanna, a friend and frequent house guest of Katseres. Hanna had at least two traffic charges pending in the summer of 1991, and Sikma was handling them for him. On July 24, 1991, Sikma appeared in court on behalf of Hanna and disposed of Hanna's charges pursuant to a plea bargain. Later that day, he telephoned Hanna at Katseres' residence to tell him the results of the court proceeding. After notifying Hanna of the disposition of his charges, Sikma proceeded to discuss with Hanna and then with Katseres his recent involvement with Morningstar and the investment opportunities with the company. These telephone conversations are at the core of this disciplinary proceeding. Although their context and content are disputed by the parties, we find the following version of the conversations most supported by the record.

As mentioned, Sikma telephoned Hanna to inform Hanna of the resolution of his case. When Sikma called, Hanna commented to Sikma that he had been trying unsuccessfully to contact him and inquired as to why Sikma had not returned his calls. Sikma advised Hanna that he was working as the CEO at Morningstar and related that this work took more of his time than he had expected, making him hard to reach at his law office. Hanna then asked what Morningstar was, and Sikma explained to him that it was a telemarketing company that was just getting off the ground.

During this telephone conversation between Sikma and Hanna, Katseres was in the background and interrupted to find out with whom Hanna was talking. After learning the person was Sikma, Katseres took the telephone receiver from Hanna and spoke briefly with Sikma about Katseres' workers' compensation case. Sikma advised her that he had no further news regarding her case.

Katseres then inquired about the new company Sikma had been discussing with Hanna, as she had overheard part of their telephone conversation. Sikma told Katseres that Morningstar was a new telemarketing company or something to that nature. Katseres asked why Sikma had not told her about this "good deal." Sikma responded that he had just recently been hired as CEO and was working for the company a few hours a day. Sikma commented that he liked dividing his time between the company and his law practice because the work was less stressful. Katseres then asked why Sikma had not brought this information to her attention earlier. Sikma explained that he did not feel it was appropriate for him to tell her about Morningstar because he is not supposed to approach clients with business proposals, but he left the impression that he had invested his own money in the company and that it was a good investment. On further inquiry, Sikma referred Katseres to Armstrong, the president and owner of Morningstar. Sikma provided Katseres with Armstrong's telephone number and again told her that he could not counsel her with regard to this matter and that she should consult with another adviser, broker, or lawyer.

As a result of her telephone conversation with Sikma, Katseres talked with Hanna about the possibility of investing some money from one of her soon-to-mature treasury bills. Hanna suggested to her that she limit her investment to no more than $5,000, and Katseres disagreed. The disagreement led to a major argument about what Katseres was going to do with her money and Hanna, who had been staying in Katseres' home, left for several days. Besides this conversation with Hanna, there is no evidence in the record that Katseres consulted with any other person or a professional advisor, except Sikma himself, concerning an investment in Morningstar.

Subsequently, Katseres telephoned Sikma and told him that she had left a message for Armstrong, but that he had never returned her telephone call. Sikma told Katseres that he had not talked with him and that all Sikma could tell her was that she had to talk with Armstrong.

Thereafter, Katseres did meet with Armstrong, and, on or about August 3, 1991, she invested $20,000 in Morningstar stock by cashing in a treasury bond she owned. Katseres also became employed by the company in the third week of September but was fired shortly thereafter.

A month later, when the company began experiencing financial problems, Armstrong asked Katseres to invest more money into the company. Complying with his request, Katseres, in the presence of Sikma and with his knowledge, gave Armstrong a check in the sum of $2,000 as a loan to Morningstar. This loan was evidenced by a promissory note signed by Armstrong on behalf of the company.

A few days later, Armstrong requested additional financing by Katseres. Katseres agreed to co-sign a line of credit for the company in the amount of $40,000, if her demands were met in return. In general, Katseres wanted Sikma more involved in the operations and financial matters of the company. In particular, Katseres demanded: (1) that Sikma individually invest "an additional $10,000" in the company, and (2) that Sikma personally guarantee the $40,000 line of credit. Responding to her demands and to Armstrong's commitment to Katseres, Sikma personally initialled and signed Katseres' written list of demands. Sikma also personally and as CEO of the company signed a guarantee for the $40,000 line of credit. Besides his written guarantee, Katseres contends Sikma also orally assured her of the financial soundness of the company. Sikma's guarantee never took effect, however, because Katseres never did co-sign for a line of credit for Morningstar.

On October 1, 1991, Sikma made his first "investment" in Morningstar. On that date, he made a personal loan to Morningstar in the sum of $25,000. Thereafter, he made an additional loan in the sum of $15,000, plus he paid $10,000 worth of a credit card debt incurred by Morningstar. Not until Sikma made these loans did Katseres learn that Sikma had not previously made a direct financial contribution to Morningstar.

Ultimately, Morningstar filed for bankruptcy. At this time, Sikma found out that Armstrong had prior felony convictions in Texas based on his operation of a similar telemarketing business in that state. Katseres lost her $22,000 investment. Sikma also lost his $50,000 financial contribution.

B. *Grievance Commission proceedings.* Upon notice from Katseres of Sikma's handling of his professional and business relationships with her, the Iowa Supreme Court Board of Professional Ethics and Conduct (Board) filed a complaint against Sikma alleging violations of several provisions of the Iowa Code of Professional Responsibility for Lawyers (Code). *See* Iowa Sup.Ct.R. 118.5. Sikma answered the complaint and subsequently appeared at a hearing on the matter before the Grievance Commission (Commission). *See id.* 118.7.

Following the evidentiary hearing, the Commission filed its findings of fact, conclusions of law, and recommendation of discipline. *See id.* 118.9. Concluding that Sikma violated DR 4–101(B)(3) and DR 5–104(A) of the Code, the Commission recommended suspension of Sikma's license to practice law within this state for a period of three months. One member of the Commission dissented. Sikma did not appeal. *See id.* 118.11.

We review de novo the record made before the Commission and decide the matter. *Id.* 118.10; *Committee on Professional Ethics & Conduct v. Shepler,* 519 N.W.2d 92, 93 (Iowa 1994).

II. *Proof burdens.* The Board generally has the burden of proof to establish by a convincing preponderance of the evidence that respondent has violated the Code as charged. *Committee on Professional Ethics & Conduct v. Peterson,* 524 N.W.2d 176, 178 (Iowa 1994) (citation omitted). However, when differing interests between the respondent and the respondent's client are involved, the respondent has the burden to establish that all the transactions were fair and equitable, and that the respondent

faithfully discharged all [the respondent's] duties to [the respondent's] client, not only by refraining [from] any misrepresentation or concealment of any material fact, but by active diligence to see that [the respon-

dent's] client was fully informed of the nature and effect of the transaction proposed and of [the client's] own rights and interests in the subject matter involved, and by seeing to it that [the respondent's] client either has independent advice in the matter or else receives from the attorney such advice as the latter would have been expected to give had the transaction been one between [the respondent's] client and a stranger.

*Committee on Professional Ethics & Conduct v. Oehler*, 350 N.W.2d 195, 199 (Iowa 1984) (citation omitted).

III. *Code violations.* The Board alleged Sikma violated several disciplinary rules, but the Commission concluded that Sikma only violated DR 4–101(B)(3) and DR 5–104(A). For the following reasons, we agree with the Commission's conclusions.

■ A. *Disciplinary Rule 4–101(B)(3).* DR 4–101(B)(3) pertinently provides: "[A] lawyer shall not knowingly: ... [u]se a confidence or secret of a client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure."

The Commission focused on two distinct elements of this disciplinary rule: (1) whether Sikma knowingly used a confidence or secret learned from his representation of Katseres, and (2) whether Sikma gained an advantage from use of such a confidence or secret. The Commission concluded, as do we, that the Board met its burden of proof with respect to each of the elements.

First, the Commission focused on whether the respondent "knowingly used a confidence or secret." The Commission found and we agree that respondent Sikma knew that Katseres had liquid assets that she could invest in Morningstar and that Sikma gained knowledge of those assets while serving as her legal counsel. About a year before Sikma and Katseres discussed Morningstar, Sikma had prepared a will for her which specifically gifted $120,000 in treasury bills. Sikma had to have known that she still had those assets in July 1991 when he informed her about Morningstar and its investment potential.

Next, the Commission discussed whether respondent "used the secret or confidence to

his advantage." In this respect, the Commission concluded and, again we agree, that Katseres' investment in Morningstar benefited Sikma in the form of continued salary, stock benefits, and reduction of liability for personal guarantees.

Finally, although the Commission did not specifically address the issue, we believe that Sikma failed to meet his burden of showing he met the rule's disclosure requirement and that of DR 5–104(A) as discussed below. The Board having met its burden and Sikma failing to show full disclosure, we, like the Commission, conclude that Sikma violated DR 4–101(B)(3).

■ B. *Disciplinary Rule 5–104(A).* DR 5–104(A) provides: "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

With respect to this rule, the Commission focused on two of its requirements: (1) whether Sikma and Katseres had an attorney-client relationship, and (2) whether Sikma made full disclosure to Katseres prior to her investment in Morningstar. *See Committee on Professional Ethics & Conduct v. Mershon*, 316 N.W.2d 895, 898 (Iowa 1982). As did the Commission, we conclude the Board showed that Katseres, as Sikma's client, expected Sikma to exercise his professional, legal judgment for her protection, and that Sikma failed to prove that he made a full disclosure to Katseres prior to her investment in Morningstar.

The existence of an attorney-client relationship is necessary for a violation of DR 5–104(A). An attorney-client relationship undisputedly existed between Sikma and Katseres when Katseres invested in Morningstar because at that time Sikma still had an open file for Katseres' workers' compensation case. Indeed, the record shows that Katseres asked Sikma about the progress of her workers' compensation case during the telephone conversation in which they first discussed investing in Morningstar.

■ Respondent admits the existence of the attorney-client relationship but argues that DR 5–104(A) can be violated only if the attorney is formally retained by the client with respect to the business transaction at issue. We reject respondent's argument. Our previous decisions and those of other courts demonstrate that DR 5–104(A) is not limited to those situations in which the attorney is formally acting as counsel in the very transaction which is the subject of the conflict of interest allegation. The rule is applicable as long as the attorney has influence arising from a previous or current attorney-client relationship, and the client is looking to the attorney to protect the client's interests. *See Committee on Professional Ethics & Conduct v. Hall*, 463 N.W.2d 30, 33–34 (Iowa 1990) (holding attorney violated DR 5–104(A) for engaging in business transactions with a client who the attorney had consistently represented in the past and who regarded the attorney "as his attorney and looked to him for advice"); *Committee on Professional Ethics & Conduct v. Postma*, 430 N.W.2d 387, 392 (Iowa 1988) (holding attorney violated DR 5–104(A) for engaging in business transaction with a client who had a reasonable right to assume a continued attorney-client relationship based on past representation); *accord In re Neville*, 147 Ariz. 106, 708 P.2d 1297, 1302 (1985) (stating "DR 5–104 is applicable as long as the influence arising from an attorney-client relationship continues"); *In re Nichols*, 95 N.J. 126, 469 A.2d 494, 497–98 (1984) (concluding attorney violated DR 5–104 for engaging in business transaction with client while continuing to represent him in unrelated criminal and matrimonial matters); *In re Discipline of Martin*, 506 N.W.2d 101, 103 (S.D.1993) (holding attorney-client element of DR 5–104(A) met where attorney represented client on other matters but not necessarily on the business transactions at issue). In this regard, the record made before the Commission clearly demonstrates that Katseres expected Sikma to exercise professional, legal judgment on her behalf, as she discussed her initial investment in Morningstar with him and then insisted that he initial her demands and personally guarantee her repayment before she would provide additional financing for Morningstar.

Although the attorney-client relationship is necessary for a rule 5–104(A) violation, it is not determinative if the attorney has met the burden of demonstrating full disclosure to the client. The record before the Commission shows Sikma at most told Katseres that he should not approach her with a business proposal and that she should seek other professional advice. We agree with the Commission that such a statement falls short of the full disclosure and knowing consent required by disciplinary rules 4–101(B)(3) and 5–104(A). Respondent had a duty to disclose his adverse interests and the effect they would have on the exercise of his professional judgment. *Mershon*, 316 N.W.2d at 899. This Sikma did not do; he did not explain to Katseres how his being CEO and legal advisor for Morningstar would affect his professional judgment or why independent counsel would benefit her. He thus failed to meet his burden of demonstrating full disclosure, a requirement an attorney at least must fulfill before engaging in a business transaction with a client. *See id.* at 899–900. Accordingly, we conclude that Sikma violated DR 5–104(A).

■ IV. *Conclusion and disciplinary sanction.* In sum, Sikma's acting in the dual capacity as CEO of a company and attorney of an investor in that company violated DR 5–104(A) prohibiting an attorney from engaging in an undisclosed business transaction with a client and DR 4–101(B)(3) prohibiting an attorney from misusing confidential information. Although the Board alleges Sikma violated other disciplinary rules, we find these allegations either have no merit or are encompassed in the rules we, along with the Commission, have found Sikma violated under a convincing preponderance of the evidence.

Having found Sikma violated our disciplinary rules, we next must determine the appropriate sanction. *See* Iowa Sup.Ct.R. 118.10. Sanctions for violations of the principle against entering into a business transaction with a client without full disclosure have ranged from public reprimand to revocation of license to practice law, depending on the

severity of the violations. *See Hall,* 463 N.W.2d at 35–36 (citations omitted). Because we believe that respondent, who has no prior disciplinary record, did not deliberately solicit Katseres' investment but rather exercised poor judgment in involving both himself and Katseres in Morningstar, we basically adopt the Commission's recommendation. We suspend Sikma's license to practice law within this state indefinitely with no possibility of reinstatement for a period of three months from the date of this opinion. *See* Iowa Sup.Ct.R. 118.12.

Costs are taxed to Sikma pursuant to Iowa supreme court rule 118.22.

**LICENSE SUSPENDED.**