Wythe WILLEY, Appellee,

v.

Tom RILEY and Tom Riley Law Firm, P.C., Appellants.

No. 94–130.

Supreme Court of Iowa.

Dec. 20, 1995.

522

David J. Dutton and James R. Hellman of Dutton, Braun, Staack, Hellman & Iverson, P.L.C., Waterloo, and T. Todd Becker, Cedar Rapids, for appellants.

Timothy S. White of White & Johnson, P.C., Cedar Rapids, for appellee.

Considered by McGIVERIN, C.J., and LARSON, NEUMAN, ANDREASEN, and TERNUS, JJ.

McGIVERIN, Chief Justice.

In this action by plaintiff attorney against defendants, his former law firm and employer, two questions are presented. On appeal, defendants contend substantial evidence did not support submission by the district court to the jury of plaintiff's claim for intentional interference with a prospective contract. On cross-appeal, plaintiff attorney contends the court erred in granting defendants summary judgment on plaintiff's claim for conversion concerning the handling of a case settlement check.

Finding reversible error only in the district court's submission to the jury of plaintiff's claim for intentional interference with a prospective contract, we reverse on the appeal and affirm on the cross-appeal. We remand for appropriate judgment.

I. *Background facts and proceedings.* In June 1987, attorney Tom Riley, of the Tom Riley Law Firm, P.C., hired attorney Wythe Willey to work as a full-time associate for the law firm. Under the terms of Willey's employment agreement, Riley agreed to compensate Willey:

   (1) A base salary of $60,000 per year, payable periodically or 60% of total billings, whichever is greater, and

   (2) A bonus equal to one-third of the firm "profits" on contingent fee cases that [Willey] handle[d] and [brought] into the office. "Profits" are generally the balance received by the [Tom Riley] office after deducting hourly charges and expenses.

   (3) For cases in which [Willey] [did] not participate, a bonus equal to 10% of the legal work that [he] [brought] into the office.

Soon thereafter, Willey went to work for Riley and the law firm and received regular compensation based on the agreement.

On March 30, 1990, Willey left several letters at the Tom Riley Law Firm office for Riley stating that he was resigning from his associate position with the law firm effective immediately. Riley was out of town on the day Willey resigned, and Willey did not inform Riley in person or over the telephone of his resignation.

Upon returning to the office on April 1, Riley learned of Willey's resignation when he found the letters left by Willey. In one letter, Willey itemized sums totaling $235,664 that he contended the law firm still owed him at the time of his resignation.

On April 12, after his resignation from the law firm, Willey filed a petition at law in district court against Riley and the law firm seeking alleged unpaid wages, damages, and attorney fees pursuant to Iowa Code chapter 91A (1989). Riley and the law firm answered and counterclaimed, alleging Willey owed the firm damages based on fees Willey allegedly received directly from clients for services rendered to clients while employed by the law firm. One alleged instance involved Willey's representation of Reese Communications Companies, Inc., a public relations company that performs lobbying work with state legislatures and the United States Congress for Philip Morris U.S.A. and other companies. This allegation involved fees Willey allegedly received from Reese and failed to turn over to his employer law firm.[1]

---

1. While Willey was a full-time associate of the law firm, Reese compensated Willey $2,500 each month under the lobbying contract. Willey had listed Reese as a "miscellaneous" client in the law firm's accounts receivable records, but Reese sent money directly to Willey. At one time, the law firm's records revealed that Reese owed Wil-

ley or the law firm $30,000. Willey admitted that he personally accepted $40,000 under his contract with Reese and owed the law firm this amount he had accepted while he was a full-time employee of the law firm. As a result, the law firm began withholding Willey's pay in Novem-

Defendants also alleged Willey wrongfully entered into a separate contract and accepted money for services from Philip Morris without payment being turned over to the law firm.

In March 1991, Willey amended his petition against Riley and the law firm to include allegations that (1) Riley intentionally interfered with prospective contractual relationships between Willey and two companies, Reese and Philip Morris, and that (2) Riley wrongfully converted a $650,000 settlement check in a wrongful death case in which Willey was the lead attorney. The conversion claim was dismissed by the court prior to trial in sustaining defendants' motion for summary judgment.

The case proceeded to trial.

The jury found defendants were liable under Iowa Code chapter 91A (1991) for wrongfully withholding $35,599.07 in wages from Willey, with $32,590.53 of that amount found to be intentionally withheld. This verdict and judgment thereon is not challenged on appeal by either party.

The jury also awarded Willey $30,000 in damages after finding defendants intentionally interfered with Willey's prospective contractual relationship with Philip Morris. The jury also found defendants intentionally interfered with Willey's contractual relationship with Reese but concluded Willey suffered no damages as a result of the wrongful interference.

The district court entered a total judgment, including liquidated damages pursuant to Iowa Code section 91A.2(6), of $98,189.60 with interest against defendants.

After the verdicts, defendants filed a motion for judgment notwithstanding the verdict, see Iowa R.Civ.P. 243, in which they claimed, as a matter of law, plaintiffs failed to generate a jury question on the intentional interference with a prospective contract claim. In its motion, defendants claimed Willey failed to prove that defendants acted with a purpose to financially injure or de-

stroy Willey. This motion was overruled and defendants filed a notice of appeal limited to the award of $30,000 to plaintiff for interference with a prospective contract with Philip Morris.

Plaintiff's intentional interference with a prospective contract claim with Philip Morris, which survived defendants' motions for directed verdict and judgment notwithstanding the verdict, is the *only* issue raised in defendants' appeal. Plaintiff's conversion claim, dismissed prior to trial pursuant to a summary judgment motion filed by defendants, is the *only* issue raised in plaintiff's cross-appeal.

The record indicates that the parties have each filed charges with the appropriate authority claiming violations of the canons of professional responsibility by the other party in actions at issue in the present case. We do not address those ethics charges in this opinion.

II. *Defendants' appeal concerning plaintiff's claim of intentional interference with a prospective contract.* The appeal, filed by defendants Riley and the law firm, is from the district court's order overruling defendants' motion for judgment notwithstanding the verdict in favor of plaintiff on plaintiff's claim for intentional interference with a prospective contractual relationship with Philip Morris. The intentional interference claim is rooted in two telephone calls initiated by Tom Riley, Willey's former employer, to Philip Morris, a company for which Willey formerly lobbied.

A. *Additional facts.* In August 1988, after Willey joined the law firm, Willey entered into a service agreement with Reese Communications Companies, Inc., to perform various services from September 1, 1988 to December 31, 1989. At that time, Reese hired Willey to be a company representative in Iowa and to manage a pilot program for Philip Morris involving grass roots lobbying efforts.

---

ber 1989 in order to recoup the amount personally collected by Willey.

Riley allegedly did not learn Willey received money directly from Reese until November 1989,

at which time Riley allegedly discovered an unpaid bill of $30,000 owed from Reese to Willey. Willey's contract with Reese terminated on December 31, 1989.

In January 1990, upon termination of his Reese lobbying contract, Willey entered into a one-year professional services agreement directly with Philip Morris to perform various federal lobbying functions for the company. Philip Morris compensated Willey $2,500 each month under the contract from January 1, 1990 to December 31, 1990.[2]

Riley allegedly did not learn of Willey's contractual agreement with Philip Morris until after March 30, 1990, the day Willey terminated his employment with the law firm. Willey admitted he never discussed with Riley his contractual relationship with Philip Morris. Riley allegedly first learned of Willey's connection to Philip Morris by way of a memorandum that was faxed from Patricia Wilson, midwest regional manager of Philip Morris' government affairs division, to Willey at the law firm on Friday, March 30, 1990 at 6:03 p.m. Wilson, in charge of Philip Morris' lobbying activities in Iowa, was the person to whom Willey reported on a regular basis. Willey had given Wilson the law firm's telephone and fax numbers in order for her to know how and where to reach him if needed. Willey did not inform Wilson of his plans to resign from the law firm and move to a new location until after he had completed his move on April 2, 1990. At the time Philip Morris faxed the memorandum to the law firm in care of Willey, Riley was out of town and Willey had already resigned from the firm and was gone from the office.

After the fax was brought to Riley's attention on Monday, April 2, Riley initiated one of two telephone calls to Patricia Wilson of Philip Morris. The first conversation occurred on April 2, the same day Riley returned to the office and learned of Willey's resignation.

On that date, prior to Riley telephoning her, Wilson telephoned the law firm and asked to speak with Willey in regard to the fax. A secretary or receptionist of the law firm informed Wilson that Willey was not in the office at that time, but, if the fax was

sent to the law firm, Willey must have received it.

Wilson was not informed during the telephone conversation with the secretary or receptionist that Willey had resigned from the firm. Wilson left a message that she was desperate to contact Willey and that "if anybody at the firm or just anyone knew where he was, to please have him call [her]." On the same day as Wilson's telephone call, Riley saw the message and fax from Wilson and then telephoned her.

When Riley telephoned Wilson, he informed her he was in possession of the memorandum that she had faxed to Willey and then he began asking her questions about Willey's relationship with Philip Morris. According to Wilson, Riley did not say anything derogatory about Willey during their telephone conversation, yet she felt very uncomfortable talking with Riley when he started asking a lot of questions. Wilson refused to answer any of Riley's questions and ended the brief telephone call. As a result of this telephone call, Wilson's supervisors instructed her to not take any more telephone calls from Riley.

Approximately two weeks to a month after Riley's first telephone call to Wilson,[3] Riley telephoned Wilson a second time and again asked her specific questions concerning Willey's relationship with Philip Morris. Once again, Wilson informed Riley that she could not answer his questions. Before this second conversation ended, Riley told Wilson that she could either answer the questions at that time or she could answer them pursuant to a subpoena. After this comment, Wilson, feeling upset by Riley's statement, abruptly ended the conversation with Riley.

Sometime during the spring of 1990, Wilson reported Riley's second telephone call to her immediate supervisor and then to Philip Morris' associate general counsel. Wilson's supervisors instructed her, based on the in-

---

**2.** In a second contract entered into between Willey and Philip Morris, effective March 1 through June 30, Willey agreed to perform lobbying at the state level for $3,500 per month.

**3.** Defendants admit, based on Wilson's recollection regarding the timing of the second telephone call, that the second telephone conversation between Riley and Wilson must have taken place *after* Willey filed his April 12 lawsuit against Riley.

formation that she told them concerning her telephone conversations with Riley, to sever all contacts with Willey. This action made it impossible for Willey to act as a lobbyist for Philip Morris.

Willey's original contract with Philip Morris was scheduled to run through December 1990. However, in July 1990, Philip Morris hired another lobbyist to do the work that Willey was responsible for prior to Philip Morris' decision to sever all contacts with him.

Wilson also testified that *but for* the two telephone calls she received from Riley, she would have continued to work with Willey under the 1990 service agreement that Willey had entered into with Philip Morris. She also stated that she would have renewed Willey's lobbying contract at the end of 1990 but for Riley's telephone calls.[4] According to Wilson, it is typical for Philip Morris to retain lobbyists or renew their contracts year after year, if possible.

In an amended petition filed in March 1991, plaintiff alleged that Riley or the law firm intentionally and wrongfully interfered with his prospective lobbying contract with Philip Morris.

B. *Whether a jury question was generated on plaintiff's claim for intentional interference with prospective contract.* The question is whether substantial evidence supports plaintiff's claim for intentional interference with plaintiff's prospective contract with Philip Morris. If the answer is yes, the district court correctly overruled defendants' motion for judgment notwithstanding the verdict for plaintiff on this claim. If the answer is no, we must reverse on this issue.

■■■ 1. *Judgment notwithstanding the verdict standards.* To determine whether substantial evidence supports plaintiff's claim for intentional interference with plaintiff's prospective contract with Philip Morris, we view the evidence in accordance with the same principles required for review by the district court. *Smith v. Smithway Motor Xpress, Inc.,* 464 N.W.2d 682, 684 (Iowa

1990). We view the evidence in the light most favorable to the party against whom the motion was made, taking into consideration every legitimate inference that may fairly and reasonably be made. *See* Iowa R.App.P. 14(f)(2); *Smithway,* 464 N.W.2d at 684; *Konicek v. Loomis Bros., Inc.,* 457 N.W.2d 614, 617 (Iowa 1990). A motion for judgment notwithstanding the verdict must stand on the grounds raised in the motion for directed verdict. *Faught v. Budlong,* 540 N.W.2d 33, 35 (Iowa 1995); *Valadez v. City of Des Moines,* 324 N.W.2d 475, 477 (Iowa 1982).

■■■ Our only inquiry in assessing a motion for judgment notwithstanding the verdict is whether there is sufficient evidence to justify submitting the case to the jury. *Faught,* 540 N.W.2d at 35; *Smithway,* 464 N.W.2d at 684. A motion for judgment notwithstanding the verdict should be denied if there is substantial evidence to support each element of the plaintiff's claims. *Faught,* 540 N.W.2d at 35; *Slocum v. Hammond,* 346 N.W.2d 485, 494 (Iowa 1984). A plaintiff must have presented more than a mere scintilla of evidence to avoid a defendant's motion for judgment notwithstanding the verdict. *See Petersen v. Farmers Casualty Co.,* 226 N.W.2d 226, 232 (Iowa 1975). Evidence is substantial when a reasonable mind would find the evidence presented adequate to reach the same findings. *Grinnell Mut. Reins. Co. v. Voeltz,* 431 N.W.2d 783, 785 (Iowa 1988); *Johnson v. Dodgen,* 451 N.W.2d 168, 171 (Iowa 1990).

■■■ 2. *Substantial evidence inquiry.* Defendants contend that plaintiff did not present substantial evidence to support each element of his intentional interference with a prospective contract claim. Because we conclude plaintiff Willey did not present at least substantial evidence that Riley's two telephone calls to Philip Morris were made for the predominant purpose to financially injure or destroy Willey, we reverse the district court's judgment on this issue.

■■■ Interference with a prospective business contract is an intentional tort which

---

**4.** We note that even though Philip Morris discontinued all contact with Willey after Riley's telephone calls to Wilson, Philip Morris paid Willey his fees in full and did not exercise its right to terminate the lobbying contract on thirty days notice.

requires a showing that the sole or predominant purpose of the actor's conduct was to financially injure or destroy the plaintiff. *Economy Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641, 651–52 (Iowa 1995); *Nesler v. Fisher & Co.*, 452 N.W.2d 191, 199 (Iowa 1990); *Page County Appliance Ctr., Inc. v. Honeywell, Inc.*, 347 N.W.2d 171, 177 (Iowa 1984); *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 799 (Iowa 1984); *Farmers Coop. Elevator, Inc. v. State Bank*, 236 N.W.2d 674, 679 (Iowa 1975); *see* II Iowa Civ. Jury Instruction 1200.8 (1990). The tort requires plaintiff to prove the following elements by a preponderance of the evidence:

1. The plaintiff had a prospective contractual relationship with a third person.

2. The defendant knew of the prospective relationship.

3. The defendant intentionally and improperly interfered with the relationship in one or more particulars.

4. The interference caused either the third party not to enter into or to continue the relationship or that the interference prevented the plaintiff from entering into or continuing the relationship.

5. The amount of damage.

*Nesler*, 452 N.W.2d at 198–99. If a defendant acts for two or more purposes, his improper purpose must predominate in order to create liability. *Harsha*, 346 N.W.2d at 799. The substantial evidence rule in Iowa requires that the circumstances have " 'sufficient probative force to constitute the basis for a legal inference, and not for mere speculation.' " *Id.* at 800 (quoting 32A C.J.S. *Evidence* § 1039, at 753–54 (1964)). "Circumstances are not sufficient when the conclusion in question is based on surmise, speculation or conjecture." *Id.*

After examining the record in the present case, we conclude plaintiff has presented no evidence that Riley's two telephone calls were made for the sole or predominant purpose to financially injure or destroy the plaintiff. Rather than presenting evidence on the issue of intent, plaintiff speculates that Riley made the telephone calls to Philip Morris due to hard feelings between himself and Riley rooted in Willey's decision to resign from Riley's law firm and Willey's filing

of a lawsuit against the law firm. Speculation, however, is not evidence and a case should not be submitted to a jury for deliberation when no evidence has been presented. *See Harsha*, 346 N.W.2d at 800.

We find, as a matter of law, no inference can be drawn to support plaintiff's interference with a prospective contract claim from the fact that Riley made two telephone calls to Wilson, one of which was made after Willey filed a lawsuit against Riley and his law firm. The evidence showed Riley telephoned Philip Morris for one purpose: to inquire into the nature and extent of the relationship between the company and one of his former employees. We find this purpose was legitimate especially in light of the fact Willey, as an associate attorney of Riley's law firm, was presumably not permitted to personally accept fees from clients without accounting for such fees to the law firm. Wilson had become a potential witness in the pending fee dispute between Willey and the defendants. Also, defendant law firm would be responsible and possibly liable for Willey's work done for Philip Morris while an associate of the defendant law firm.

Furthermore, if Philip Morris chose to terminate Willey's lobbying contract after Riley telephoned the company or after learning of Willey's legal dispute with Riley, that was Philip Morris' choice and the termination of the lobbying contract was merely incidental to Riley's legitimate inquiries to Philip Morris regarding his associate's dealings with the company.

Unlike Willey's contentions, there is simply no evidence to support plaintiff's speculation that Riley acted with an improper motive or acted with the intent to financially injure or destroy Willey or his lobbying business. The record is absent of any evidence that Riley, who is not a lobbyist, would have any reason to interfere with his former associate's lobbying business. We emphasize that plaintiff and defendants agree Riley said nothing derogatory to Wilson about Willey during either of the telephone calls at issue.

Other cases have similarly dismissed intentional interference with prospective contract claims for lack of substantive evidence to

support the claim. *See, e.g., Schaefer v. Cerro Gordo County Abstract Co.*, 525 N.W.2d 844, 847 (Iowa 1994) (affirming summary judgment for defendant abstract company against plaintiff's claim for intentional interference with a prospective business advantage; plaintiff presented no evidence that defendant actually knew of the prospective business advantage or that defendant intended to financially injure or destroy the plaintiff); *Water Dev. Co. v. Board of Water Works*, 488 N.W.2d 158, 162 (Iowa 1992) (affirming summary judgment for defendant public water works against plaintiff private water company's claim for intentional interference with prospective contract; the court concluded: "While termination of the [private water company's] water contracts was the result of the [public] water works' installation of its new system, we do not believe that an improper motive was the primary consideration, and there was no substantial evidence that the predominant purpose of the installation of the system was to terminate the [private water company's] water contracts."); *Preferred Mktg. Assocs. Co. v. Hawkeye Nat'l Life Ins. Co.*, 452 N.W.2d 389, 395–96 (Iowa 1990) (reversing district court's denial of defendant's motion for directed verdict on the grounds that "[t]here was no evidence that Hawkeye improperly interfered with prospective contractual or business relationships of [Preferred Marketing Associates Co.] Hawkeye did no more than it was entitled to do under its contract with [Preferred Marketing], that is, terminate the contract at will. Of course this destroyed [Preferred Marketing's] ability to profit from future Hawkeye policyholders, but that result was incidental to the pursuit of Hawkeye's own ends by proper means. As such, it is not actionable."); *Page County Appliance Ctr.*, 347 N.W.2d at 178 (reversing district court's denial of defendant's motion for directed verdict on the grounds that plaintiff "did not introduce substantial evidence of a purpose on the part of either defendant to injure or destroy the Appliance Center's business"); *Harsha*, 346 N.W.2d at 800 (holding plaintiff's claim for intentional interference with prospective business relations should not have been submitted to the jury because substantial evidence did not exist to show defendant acted with a predominately improper purpose; the court concluded: "*Substantial* evidence of a connection between [defendant's] refusing further long-term credit and [a later transaction] does not appear. Any relationship is simply too attenuated. This tort basis of liability should not have been submitted for jury consideration."). *But see Economy Roofing & Insulating Co.*, 538 N.W.2d at 652 (holding evidence generated a fact question to support plaintiff's claim that defendant's dealings with a third party were part of defendant's scheme to financially harm or destroy plaintiff's business); *West v. Wessels*, 534 N.W.2d 396, 399 (Iowa 1995) (holding genuine issue of material fact exits on discharged superintendent's claim for tortious interference with a prospective contractual relationship); *Nesler*, 452 N.W.2d at 196 (holding substantial evidence existed on the knowledge element of plaintiff's interference with a prospective business advantage claim, and the court erred by sustaining defendants' judgment notwithstanding the verdict).

In sum, we conclude defendants' motion for judgment notwithstanding the verdict on plaintiff's claim for intentional interference with a prospective contract with Philip Morris should have been sustained, and, thus, we reverse the district court's ruling to the contrary.

III. *Plaintiff's cross-appeal concerning his conversion claim.* The cross-appeal, filed by plaintiff Willey, concerns the district court's grant of defendant's pretrial motion for summary judgment on plaintiff's conversion claim, set forth in Willey's amended petition. The conversion claim is rooted in the endorsement and disposition of a settlement check in a wrongful death case primarily handled by Willey, during his tenure with the Tom Riley Law Firm, entitled "In the Matter of the Estate of Jamie Lynn Harder."

A. *Additional facts.* The Harder litigation began in May 1988 and ran through February 1990. The origin of the litigation was the death of Jamie Lynn Harder in an accidental airplane crash in Colorado on April 3, 1988. Jamie was the seventeen-year-old daughter of John and Carole Harder.

John Harder, administrator of his daughter's estate, hired Willey and the law firm to represent the estate of Jamie Harder in a negligence/wrongful death lawsuit against various persons, including the manufacturers, owners, and operators of the aircraft whose alleged negligence caused his daughter's death. John Harder retained Willey and the law firm to investigate and litigate an action based upon the wrongful death of his daughter on a one-third contingent fee basis. Suit was filed.

The parties settled the lawsuit for $650,000 on January 17, 1990. The settlement was approved by the district court on January 22, the date the case was scheduled to go to trial. On February 2, 1990, Riley sent a law firm employee to the office of the Harder case defense counsel in Davenport to obtain the settlement check. On or about the same date, Willey signed Riley's name to a letter directed to the defense counsel claiming that interest was accruing on the settlement, and the law firm desired the settlement check to be remitted promptly to "John Harder, Executor of the Estate of Jamie Harder and *Tom Riley Law Firm, P.C.*" (Emphasis added.) Defendants' insurer issued a check, prior to receiving Willey's request, in the amount of $650,000 payable to the following named payees: "John Harder, Individually and as Administrator of the Estate of Jamie Lynn Harder, and Carole Harder, and *Wythe Willey,* their attorney." (Emphasis added.) The law firm was not a named payee as Willey himself had desired.

When Riley's employee returned from Davenport with the settlement check, Riley and/or his agents, including Lisa Thirnbeck, Riley's daughter, endorsed the check in the names of the named payees "for deposit only" and deposited the entire settlement amount into the Tom Riley Trust Account at the City National Bank, which is also the Harders' bank.[5]

On the same day that Riley deposited the $650,000 settlement amount in the law firm's trust account, Riley transferred two-thirds of the settlement, or $433,334 into a ten day, renewable certificate of deposit in the name of John and Carole Harder.[6] The certificate of deposit earned 7½% interest at the time. At the end of the ten days, the funds were transferred into a money market account in the Harders' name in anticipation that the check would clear by that date. On February 27, the law firm issued a check to the Harders for $424,341.58 after deduction of expenses owed by the Harders to the defendant law firm.

The law firm was left with its prospective one-third contingency fee, or $216,666, in its trust account. Of this amount, Riley transferred $166,666 into a ten day, renewable certificate of deposit, also earning 7½% interest, in the law firm's name. Riley transferred the remaining $50,000 into the law firm's general account. All of the transactions initiated by Riley concerning the settlement proceeds occurred prior to February 28, the date the district court authorized the fees and expenses of the law firm arising from its litigation in the wrongful death action to be paid by the administrator of Jamie Harder's estate.

Pursuant to Willey's employment contract with the law firm, the law firm paid him $54,192.19 as a bonus for his work on the Harder case.

In March 1991, based on Riley's handling of the settlement check, Willey amended his earlier petition and claimed the defendants wrongfully converted the settlement check

5. In answer to Willey's requests for admissions, defendants explained why Riley handled the settlement check in the manner in which he did: "In the absence of Wythe Willey from the office and the non-availability of the Harders and, further, in keeping with long-standing office procedure and the knowledge of the Harders, Tom Riley endorsed the settlement check...." Defendants further contend Willey was aware of the law firm's check handling procedure and assented to it since 1987. Defendants also claim Riley, not Willey, informed the Harders that the settlement check, when received, would be deposited in the law firm's trust account in order for the large sum to begin earning interest, a practice to which defendants assert the Harders also assented.

6. The $433,334 amount represented money owed to the Harder estate under the one-third contingent fee agreement entered into at the beginning of Willey and the law firm's representation of Jamie Harder's estate in 1988.

by endorsing Willey's name and depositing the check in the law firm's trust account.

In January 1993, pursuant to defendants' motion, the district court dismissed Willey's conversion claim in a summary judgment order. Defendants successfully contended that neither Riley nor the law firm were liable to Willey for conversion because there was no wrongful control or dominion over the Harder settlement draft on behalf of the defendants as far as Willey was concerned.

Plaintiff cross-appealed the court's grant of summary judgment for defendants on his conversion claim.

B. *Whether a genuine issue of material fact existed as to plaintiff's conversion claim.* On cross-appeal, plaintiff Willey contends the district court erred in sustaining defendants' motion for summary judgment concerning plaintiff's claim for conversion in defendants' handling of the $650,000 check settling the Jamie Harder estate wrongful death claim.

■ 1. *Summary judgment standards.* A defendant may move for summary judgment as to all of the claims asserted against the party under Iowa Rule of Civil Procedure 237(b). *Millington v. Kuba,* 532 N.W.2d 787, 792 (Iowa 1995); *Hoffnagle v. McDonald's Corp.,* 522 N.W.2d 808, 811 (Iowa 1994). The movant has the burden of establishing the absence of any genuine issue of material fact and its entitlement to judgment as a matter of law. Iowa R.Civ.P. 237(c); *Millington,* 532 N.W.2d at 792. When the movant has met this burden, we will uphold a district court's grant of summary judgment. *Millington,* 532 N.W.2d at 792.

■ When ascertaining whether the district court correctly concluded the movant has met its burden, we examine whether, upon the basis of such material before the court as would be competent proof at trial, the court would have been compelled to direct a verdict for the movant. *Id.* If a directed verdict, *see* Iowa R.Civ.P. 216, would have ultimately been required, then summary judgment is proper, and we will uphold the judgment sustaining the movant's motion. *Millington,* 532 N.W.2d at 792.

The record, for purposes of this summary judgment cross-appeal issue, consists only of the pleadings, motion for summary judgment and resistance, depositions, affidavits, exhibits, and answers to written interrogatories. *See* Iowa R.Civ.P. 237(c).

■ 2. *No genuine issue of material fact.* On cross-appeal, plaintiff asks that we reverse the district court's order sustaining defendants' motion for summary judgment on the conversion issue, and remand the case to the district court for trial on Willey's claim of conversion against defendants Riley and the law firm.

Plaintiff's argument hinges on his belief that he had a future possessory interest in the Harder settlement check, and, therefore, Riley committed the tort of conversion when he endorsed the check in Willey's name and deposited it in the bank in the law firm's trust account.

The cross-appeal leaves us in the precarious position of analyzing a district court's pretrial partial grant of a motion for summary judgment after the case has been tried to a jury on other issues. *See Grefe & Sidney v. Watters,* 525 N.W.2d 821, 825–27 (Iowa 1994). At trial, plaintiff Willey prevailed to the extent of $98,189.60 in damages on his breach of contract wage claim and his intentional interference with a prospective contract claim.

Plaintiff now asks for a trial on his earlier conversion claim stating that the "jury likely would have awarded Willey punitive damages" due to Riley's intentional conduct when he endorsed the check in the names of the Harders and Willey. In his briefs, plaintiff does not claim he is entitled to any additional compensatory damages based on the alleged conversion. In fact, the record shows that Riley paid Willey his bonus for his handling of the Harder matter. Other compensation matters were decided by the jury in Willey's wage claim.

With this background, we turn to the district court's ruling on the pretrial motion for summary judgment. The only issue that the court was to resolve was whether there were any genuine issues of material fact in dispute

concerning plaintiff's conversion claim that needed to be resolved by a jury.

We believe the district court correctly held no genuine issue of material fact existed. The court did not err when it granted defendants' motion for summary judgment on plaintiff's conversion claim. The court's rationale is sound and supported by Iowa law.

First, we find Riley had implied authority to sign Willey's name to the $650,000 settlement check. Willey knew that even though his name was listed as a payee on the settlement check, the law firm was the co-payee requested by Willey along with the Harders.

Willey argues the Uniform Commercial Code supports his claim for conversion. Although it is true that "[a]n instrument is converted when ... it is paid on a forged endorsement," Iowa Code § 554.3419(1)(c) (1989),[7] plaintiff must first prove the endorsement was a forgery. Forgery is a crime defined in Iowa Code section 715A.2. The Uniform Commercial Code states an unauthorized signature means "one made without actual, implied, or apparent authority and includes a forgery." *Id.* § 554.1201(43). As we believe Riley had implied authority to sign Willey's name on the settlement check, and furthermore that Riley has not been charged with or convicted of the crime of forgery, no conversion exists under the statute cited by Willey.

Second, while we do not condone Riley's acts concerning the handling of the Harder settlement check, we conclude Riley could not have converted a chattel as against Willey that Willey had no right to control prior to probate court approval of attorney fees to be paid from the estate to the law firm. *See, e.g.,* Iowa Code §§ 633.197, 633.198, 633.200 (regarding court authorization of payment of attorney fees from a decedent's estate); *Committee on Professional Ethics & Conduct v. Peterson,* 524 N.W.2d 176, 179 (Iowa 1994) (sanctioning an attorney for accepting fees from a decedent's estate prior to probate court authorization); *Committee on Professional Ethics & Conduct v. Jackson,* 492

N.W.2d 430, 433 (Iowa 1992) (same); *Matter of Estate of Snapp,* 502 N.W.2d 29, 35 (Iowa App.1993) ("It is well settled that Iowa Code sections 633.197, 633.198, and 633.200 expressly require court approval for compensation of executors and attorneys.").

We agree with the district court that plaintiff's conversion claim fails as a matter of law because Willey, an associate of the defendant law firm, had no right to any attorney fees from the check until the probate court authorized the estate to pay the law firm its one-third contingency fee. A conversion claim cannot lie on behalf of a party who has no right to control the chattel which the party claims was converted. *See* Restatement (Second) of Torts § 222A. After probate court authorization, Willey could be paid by the law firm pursuant to their 1987 fee arrangement. The parties do not dispute the fact that Riley's endorsement of the settlement draft and handling of the instrument by the bank occurred prior to the probate court's authorization of attorney fees to be paid from the Harder estate to the law firm. In any event, the check was the property of the firm and not Willey.

Therefore, we affirm the district court's grant of summary judgment for defendants on the conversion cross-appeal issue.

IV. *Disposition.* On the appeal issue, we reverse the portion of the district court's judgment overruling defendants' motion for judgment notwithstanding the verdict on the intentional interference with a prospective contract claim concerning Philip Morris. Finding no reversible error on the conversion issue, however, we affirm the cross-appeal. The case is remanded for entry of judgment consistent with this opinion. Costs on appeal are taxed to plaintiff Willey.

**REVERSED ON APPEAL; AFFIRMED ON CROSS–APPEAL; REMANDED.**

---

7. We note that Iowa Code § 554.3419 (1989) has since been rewritten and renamed by the legislature "Instruments signed for accommodation." *See id.* § 554.3419 (1995). The legislature also recently added Iowa Code section 554.3420 (1995), effective July 1, 1995, which is entitled "Conversion of an instrument." As statutes are presumed to apply prospectively, *id.* § 4.5, Iowa Code section 554.3420 does not apply to the present case.