**THE MARLEY COMPANY, Plaintiff,**

v.

**FE PETRO, INC. and Charles C. Franklin, Defendants.**

**FE Petro, Inc., Plaintiff,**

v.

**The Marley Company, Defendant.**

**No. Civ. 3–97–70025.**

United States District Court,
S.D. Iowa,
Davenport Division.

Sept. 23, 1998.

Thomas N. Kamp, Lane & Waterman, Davenport, IA, Neil B. Siegel, Robert M. Masters, Sughrue Mion Zinn MacPeak & Seas, Washington, DC, for Marley Company, plaintiff.

David J. Meloy, Stanley Lande & Hunter, Muscatine, IA, John C. Hendricks, Stanley Lande & Hunter, Davenport, IA, Timothy J. Vezeau, Martin T. Lefevour, Marshal O'Toole Gerstein, Murrary & Borun, Chicago, IL, for Fe Petro, Inc., Charles C. Franklin, defendants.

## MEMORANDUM OPINION, RULINGS ON MOTIONS FOR SUMMARY JUDGMENT, AND ORDERS

VIETOR, District Judge.

The Marley Company ("Marley") brings this action against Charles Franklin and FE Petro, Inc. ("FE Petro"),[1] concerning submersible pump technology used in gasoline stations. Marley organizes its complaint into the following counts: (1) conversion by Franklin; (2) specific performance of technical employee agreements requiring assignment of patent rights from Franklin to Marley; (3) misappropriation of trade secrets by Franklin and FE Petro; (4) declaratory judgment for patent invalidity, unenforceability, and non-infringement; (5) unfair competition by Franklin and FE Petro; and (6) implied license under shop right. FE Petro originally filed its own action for patent infringement against Marley in the United States District Court for the Western District of Wisconsin. That case was transferred to this court and consolidated with the present case.[2] Petro also filed an answer to Marley's complaint which contained the following counterclaims: (1) Lanham Act violation; (2) defamation of Franklin; (3) defamation of FE Petro; and (4) abuse of process. Petro moves for summary judgment on Marley's conversion, misappropriation, assignment, shop right, and unfair competition claims. Marley resists and moves for summary judgment on Petro's Lanham Act, defamation, and abuse of process claims. The motions are submitted.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of their case for which they have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Continental Grain Co. v. Frank Seitzinger Storage, Inc.,* 837 F.2d 836, 838 (8th Cir. 1988). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Johnson v. Schopf,* 669 F.Supp. 291, 295 (D.Minn.1987). The quantum of proof that the nonmoving party must produce is not precisely measurable, but it must be "enough evidence so that a reasonable jury could return a verdict for the nonmovant." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Johnson,* 669 F.Supp. at 295–96.

### FACTS

For the purposes of this motion, the following facts are undisputed. Franklin has worked in the petroleum pump business for over thirty years. Franklin spent a majority of this time working for Marley in a number of different capacities. Franklin progressed from working in Marley's engineering department, where he

1. Unless otherwise indicated, "FE Petro" refers to FE Petro, Inc. and "Petro" refers generically to both Mr. Franklin and FE Petro, Inc.

2. In his ruling on Marley's motion to consolidate, Magistrate Judge Walters indicated that there is a dispute as to which party should be designated as plaintiff and which as defendant. Judge Walters indicated that the matter would be taken up at the final pretrial conference and, if a dispute remains, the trial judge will align the parties.

worked from 1967 until 1970, to Vice President of Sales and Marketing. While Vice President of Sales and Marketing at Marley, Franklin and his department would request the engineering department to consider certain design changes or new products, or to address certain problems uncovered in the field. In 1980, while Vice President of Sales and Marketing for Marley, Franklin requested the engineering department to consider performing a feasibility study into the concept of adjustable piping for the fuel pumps. Ronald E. Green, Marley's Manager of Engineering in 1980, approved Franklin's request for "Engineering Action" to determine the feasibility of providing four foot pumps with adjustable piping to fit tanks with various diameters and depths. In response to this request, the engineering department developed two technical drawings of the proposed piping dated February 15, 1980, one drawing dated May 7, 1980, and a working model of a telescoping pipe assembly.

The two technical drawings dated February 15, 1980, and the working model were created by Elmer Deters, a former engineer with Marley who was working as an independent consultant for the company in 1980. Deters and Marley entered into a technical employee agreement dated February 22, 1972, which provided that, in exchange for Deters' continued employment at Marley, Deters disclose and assign to Marley all inventions made by him during the period of his employment with Marley. Deters also agreed not to keep or retain any drawing, blue print or other reproduction or list, schedule, extract or other data as to any matter, concept, idea or other thing in or prepared from the records of Marley. Deters and Marley subsequently entered into a consulting agreement dated August 31, 1978, which did not include any obligation to transfer or assign any rights in his ideas, work product, or inventions to Marley. Marley hired Deters under this consulting agreement to do general work on Marley's products, including the modification of existing products to reduce cost or solve reliability problems; the development, design, and model preparation of new products; patent review; and other consultation. Although not required under the consulting agreement, Deters assigned patent applications to Marley while working as a consultant.

Richard Allender, an engineer at Marley, prepared the technical drawing of the telescoping pipe coupling dated 5–7–80. Allender based his drawing on the Deters' drawing dated 2–15–80. Allender has detailed recall of the telescoping pipe project and of the assembly design discussed at that time.

Marley also assembled a Value Analysis ("VA") team to study the telescoping pipe assembly and to determine the feasibility of implementing such a design in its commercial product line. The members of the team included: Betty Golden, Charles Ostert, Allender, and Curt Trondson. Golden, the recording secretary for the VA team, was also Franklin's secretary. Golden, Ostert, and Allender recall the telescoping pipe assembly project and their service on the VA team. Ostert specifically recalls the aforementioned drawings and model. Ostert saw the model only once when he received it for storage in the engineering laboratory. Trondson is now an employee of FE Petro.

Work on this variable length or telescoping pipe project initiated by Franklin apparently ended on December 3, 1980. At that time, Marley's engineering department decided to "[d]efer further work on this project at this time." The project cover sheet, denoting the termination of the project, was distributed to Franklin and others. The engineering file for this project, containing the aforementioned technical drawings, were maintained in the engineering department at Marley. The files were available to those who had a desire to review such information. Franklin, like other employees at Marley, had access to the engineering files. However, Marley's former and current employees do

not have personal knowledge of whether Franklin received the results of this 1980 project—whether he saw the technical drawings dated February 15, 1980, and May 7, 1980, and the working model of a telescoping pipe assembly. Franklin asserts in his affidavit that he does not recall seeing and does not believe he saw any of the aforementioned technical drawings prior to this litigation. Franklin also asserts that he did not know that a model pipe assembly had been built at Marley in 1980.

Pursuant to a 1980 employment agreement with Marley, Franklin agreed, in exchange for continued employment at Marley, to disclose and assign all inventions made by him during the period of his employment. Franklin also agreed not to keep or retain any drawing, blue print or other reproduction or list, schedule, extract or other data as to any matter, concept, idea or other thing in or prepared from the records of Marley.

The United States Patent and Trademark Office issued U.S. Patent No. 5,577,-895 (" '895 patent"), titled "Submerged Pump Unit Having a Variable Length Pipe Assembly," to FE Petro, Inc. on November 26, 1996. This patent discloses and claims a variable length pipe assembly for connecting a pump-motor unit to a manifold assembly. The named inventors on the '895 patent are Franklin, Donald P. Kenney, and Brian C. Green. All three are employees of FE Petro. Marley has manufactured and offered for sale a variable length pipe assembly designated as the "Red Jacket T-feature Telescoping Column Pipe." Marley's pipe assembly was publicly displayed at a trade show in Orlando, Florida in October 1996. Employees of FE Petro, including Franklin, were at the trade show and saw Marley' pipe assembly. Franklin further observed handouts distributed by Marley at the trade show which described the coupling mechanism of Marley' pipe assembly. Marley' promotional literature describes the Red Jacket T-feature Telescoping Column Pipe as a telescoping pipe assembly

having a telescoping adapter with an "O" ring seal and a thread-locking design that provides a clamping force along the engagement surface. From the display and the literature, Franklin formed a belief that Marley's assembly had a pair of telescoping column pipes that formed an outer annulus for carrying gasoline from a tank to a manifold unit. At the October 1996 trade show, Jamie Leonard from Red Leonard & Associates, a company which sells FE Petro products in Ohio, told John Myers, Marley's Vice President of Sales, that Leonard understood that Marley was in violation of FE Petro's patent.

FE Petro routinely distributed "Monthly Sales Reports" to its sales representatives. These reports contained comments about Marley's telescoping pipe product after it was introduced at the October 1996 trade show. The October 16, 1996 report noted: "They did a nice job of copying us ***." The December 2, 1996 report reads:

> The Patent is no longer pending: Patent number 5,577,895 was issued November 26, 1996 for *Submerged Pump Unit Having a Variable Length Pipe Assembly*. I have read the patent and we just see no way that the competition can actually sell their variable length version. We patented their version also. And yes, we are going to pursue stopping them from selling it.

The January 8, 1997 report reads:

> Variable Length Patent: The competition received our notice of patent infringement on December 20. We know the product i[s] not through UL yet, so we know they have not sold any yet. As soon as anyone sees one of their "T" variable length units in distributor stock, please let us know. When that happens, the legal boys go after them with vengeance.

In a letter memorandum dated February 13, 1997, from FE Petro to its Domestic Sales Team, FE Petro warned: "Our position is not to take this to the market place any further than it already is. There should be no threatening comments to any

user/distributor that they will be brought into this if they purchase the competition's product."

After the trade show, an independent sales representative for Petro, Peter Sokoloff of Sunbelt Industries, informed an engineer at Unocal, a potential client, that Petro had a patent on Petro's variable length feature and that Petro would be enforcing the patent. This conversation was conducted in connection with a bid for a Unocal contract. Sokoloff admitted to discussing FE Petro's patent, and FE Petro's plan to enforce the patent against Marley, with Trondson, a FE Petro employee.

On December 17, 1996, FE Petro notified Marley by letter of the issuance of the '895 patent. On January 8, 1997, Nyle LaGrange, then Executive Vice President and General Manager of Marley, contacted Franklin by phone and suggested that FE Petro grant Marley a license under the '895 patent. On January 17, 1997, FE Petro informed Marley that it was not in Fe Petro's best interests to grant such a license. Subsequent to January 17, 1997, Marley continued to manufacture and market its pipe assembly, which was redesignated as the Red Jacket "Quick–Set" pipe assembly.

On January 30, 1997, Petro filed a patent infringement action against Marley in the United States District Court for the Western District of Wisconsin. On January 31, 1997, Marley filed suit against Petro in this court. Approximately one week later, on February 4, 1997, Marley sent its filed complaint to its customers which consisted of roughly 600 distributors, excluding major oil companies. About 100 of these distributors carry both FE Petro's and Marley's products. In this mailing to its customers, Marley included a letter from John Myers, Vice President of Sales at Marley. The complaint and letter traveled through interstate commerce, arriving at companies across the country.

Marley's complaint outlined its claims against FE Petro and Franklin. Specifi-cally, Marley stated in its complaint that, inter alia:

> FE Petro has unfairly competed with Marley by utilizing knowledge regarding variable length pipe assemblies for use with submersible pumps, which was misappropriated by Franklin. \*\*\* Franklin has misappropriated that trade secret information, converted it to his own good, and falsely alleged that he was an inventor of the variable length pipe assembly disclosed in the '895 patent. Franklin defrauded the United States Government in contending that he was an inventor and assigning ownership rights to FE Petro.

> \* \* \* \* \* \*

> Marley asks this court to protect its valuable technology and expertise from FE Petro and Franklin's calculated plan to misappropriate and convert Marley's technical information.

In the letter accompanying Marley's complaint, Myers stated, inter alia, that "FE Petro's patent is clearly invalid" and that Marley's new product, the Quick–Set, was "now ready for shipment." As the year 1997 progressed, FE Petro experienced a decreased trend in sales growth.

FE Petro received a Marley T-feature pipe assembly sometime in March of 1998. An internal report was generated at FE Petro based on the tear down of the Marley device. Donald Kenney, FE Petro's Vice President of Engineering, acknowledged that he was unaware of anyone at FE Petro who had knowledge of the inner conduits or seals in the Marley product prior to receipt and tear down of the Marley product.

## DISCUSSION

By grounding their arguments only upon Iowa state law, the parties seemingly agree that Iowa law governs resolution of all non-federal claims at issue in the summary judgment motions. I agree.

### Marley's Conversion and Misappropriation Claims

▮ In Count I of its complaint, Marley alleges that Franklin converted the "subject matter of the '895 patent" from the information given to him while he was an employee of Marley. In Count III, Marley alleges that Franklin misappropriated the trade secret information developed during the 1980 research at Marley by using that information to provide the technical content for the '895 patent. Both parties refer the court to the Iowa statutory provisions discussing the misappropriation of trade secrets. *See* Iowa Code § 550 *et seq.* Accordingly, the court treats Count III as a statutory misappropriation claim instead of a common law misappropriation claim.[3]

### *Intellectual Property Cannot be Converted*

▮ Petro seeks summary judgment on Marley's conversion claim because intellectual property is not a type of property that can be converted. Petro contends that the Iowa Supreme Court found the tort of conversion inapplicable to intellectual property in *Kendall/Hunt Publ'g Co. v. Rowe*, 424 N.W.2d 235, 247 (Iowa 1988). I disagree. First, the court did not adopt a general rule against the application of conversion to intellectual property. Rather, the court merely agreed with the district court that "the law of conversion does not apply to the design and layout of printed material." *See id.* at 247. Second, although the court stated that its decision was based upon the nature of the property at issue, its analysis concentrated on the fact that the defendant's use of the property was not inconsistent with the plaintiff's continued use of the property. *See id.* To the extent '895 patent precludes Marley from using the variable length technology

Deters developed in 1980, this portion of the *Kendall* analysis is distinguishable.

Accordingly, it appears to this court that the applicability of the tort of conversion to intellectual property remains an open question in Iowa. *Cf. Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 316 (Iowa 1998) (suggesting that the Iowa Supreme Court has yet to decide whether to recognize the common law tort of misappropriation of intellectual property.). This court must therefore determine what the Iowa Supreme Court would probably hold were it called upon to decide the issue. *See Hazen v. Pasley*, 768 F.2d 226, 228 (8th Cir. 1985). It is undisputed that the tort of conversion was traditionally applied only to chattels or tangible property that could be lost or found. *See* Restatement (Second) of Torts § 242, cmt. d. Moreover, this court recognizes that the coverage of the conversion cause of action has slowly been expanded beyond these traditional limits. *See id.; see also Hurst v. Dezer/Reyes Corp.*, 82 F.3d 232, 235 (8th Cir.1996) ("The expanded attention given intangible and intellectual property rights in recent decades has produced theories for expanding the tort of conversion to include misappropriation of such intangibles."). The applicability of the conversion cause of action to intellectual property, however, remains hotly disputed. *See generally* Jeff C. Dodd, *Rights in Information: Conversion and Misappropriation Causes of Action in Intellectual Property Cases*, 32 Hous. L.Rev. 459 (1995) (discussing trend expanding tort of conversion to cover some types of intellectual property); Val D. Ricks, *The Conversion of Intangible Property: Bursting the Ancient Trover Bottle with New Wins*, 1991 B.Y.U.L.Rev. 1681 (1991) (same). Absent some indication from the courts of Iowa embracing such an expansion, I am unable to conclude that

---

**3.** The analysis and result of this opinion would not change if in fact the plaintiff had raised a common law misappropriation claim. To prove a common law claim, Marley would have to show (1) the existence of a trade secret; (2) acquisition as a result of a confidential relationship; and (3) unauthorized use of the trade secret. *See Basic Chemicals, Inc. v. Benson*, 251 N.W.2d 220, 226 (Iowa 1977).

the Iowa Supreme Court would recognize Deters' ideas, and not the drawings themselves, as the type of property that can be converted. The Iowa Supreme Court is especially unlikely to expand the law of conversion under circumstances where, as in this case, the law and concepts related to the misappropriation of trade secrets provide a more appropriate avenue or redress for the complainant, and where any recovery under the expanded conversion cause of action would merely be duplicative. *See Pioneer Hi–Bred Int'l, Inc. v. Holden Foundation Seeds, Inc.*, No. 81–60–E., 1987 WL 341211 (S.D.Iowa 1987), aff'd. by 35 F.3d 1226 (8th Cir.1994) (declining to expand the tort of conversion if misappropriation of trade secrets cause of action provided sufficient redress).[4] Moreover, as Judge O'Brien noted in *Pioneer:* "[W]hen dealing with novel questions of Iowa law, this Court is very concerned about the possibility of establishing broad legal precedents which could lead to undesirable and unintended results in future cases." *See id.* at *35–36. Accordingly, Petro's summary judgment motion will be granted as to Count I, because I predict that the Iowa Supreme Court would conclude that the intellectual property at issue is not the type of property that can be converted.[5] *See Hanson v. Hancock County Memorial Hosp.*, 938 F.Supp. 1419, 1439 (N.D.Iowa 1996) (finding privacy interest not the type of intangible property to which a conversion claim could apply); *Kendall/Hunt*, 424 N.W.2d at 247 (finding conversion inapplicable to design and layout of printed material).

**4.** While I am unclear as to the conclusion Judge O'Brien reaches on this issue in *Pioneer*, the case does not, in any event, squarely hold that intellectual property is the type of property that can be converted.

**5.** This holding is limited to the specific facts of this case, and as the comments to the Restatement explain, nothing in this opinion "is intended to indicate that in a proper case liability for intentional interference with some other kind of intangible rights may not be found." *See* Restatement (Second) of Torts § 242, cmt. f (1985).

*Marley's Ownership Interest in the Information*

■ Petro seeks summary judgment on Marley's misappropriation claim in Count III, contending Marley has no ownership interest in Deters' drawings and therefore no standing to sue for misappropriation of the information contained therein. Marley contends that it has ownership interest in Deters' drawings pursuant to a Technical Employee Agreement executed by Marley[6] and Deters in 1972. Under the terms of this agreement, Deters agreed to disclose and assign to Marley all inventions made by him during the period of his employment. Petro argues that this agreement was superceded by a Consulting Agreement executed by Marley and Deters in 1978. The Consulting Agreement contained no language concerning assignment of ownership interests in ideas or inventions. Petro argues that in the absence of such language Deters owned any work product or invention he created after executing the 1978 agreement, including the variable length technology he developed for Marley in 1980.

I conclude that the Consulting Agreement did not rescind or supercede the Technical Employee Agreement, but rather supplemented the agreement. The Technical Employee Agreement was supported by consideration. In exchange for continued employment for an indefinite period of time, Deters promised to disclose and assign all inventions and ideas to Marley insofar as they were related to Marley's business. *See Curtis 1000, Inc. v.*

**6.** Marley has previously done business under the names Red Jacket Manufacturing Company and Red Jacket Pumps. The company entered some of the agreements at issue prior to adopting the Marley name. The parties do not raise any argument as to the significance of these name changes. Accordingly, for ease of reading, the court will refer to the company involved in executing these agreements as Marley.

*Youngblade,* 878 F.Supp. 1224, 1259 (N.D.Iowa 1995) (noting that continued employment was sufficient consideration to support covenant not to compete). Because the Consulting Agreement did not in any way conflict with the provisions of the Technical Employee Agreement, but rather filled in the gaps of the Technical Employee Agreement by expressly defining Deters' duties and compensation, it is unclear whether the Consulting Agreement must be supported by new consideration. *See Recker v. Gustafson,* 279 N.W.2d 744 (Iowa 1979) (requiring new consideration to support modification of price in real estate contract). Assuming without deciding that the addition of terms, as opposed to the modification of terms, requires new consideration, such consideration is present in this case. Marley provided additional consideration in the form of mileage and monthly compensation and Deters provided new consideration in the form of agreeing to perform specific duties and responsibilities.

In addition, although the Consulting Agreement represents a change in the working relationship between Marley and Deters, nothing in the record suggests that the Consulting Agreement was intended to rescind the Technical Employee Agreement. Indeed, Deters remained a valuable technical employee who continued to receive medical and life insurance coverage in the same manner as he did prior to the execution of the Consulting Agreement. Moreover, the conduct of the parties suggests that the Technical Employee Agreement remained in effect after 1978. In 1979 and 1981, Deters assigned patents he filed in those years to Marley for $1.00 "and other good and valuable consideration," namely his continued employment. Accordingly, I conclude that Marley has presented sufficient evidence that it acquired ownership rights in Deters' variable length inventions under the terms of the Technical Employee Agreement to survive summary judgment.

*Sufficiency of Evidence to Support Misappropriation Claim*

Petro also contends that summary judgment is appropriate on Marley's misappropriation claim because Marley has failed to provide sufficient evidence that Franklin observed the contents of Deters' work product and improperly used or disclosed those contents. I disagree. Rather, I conclude that Marley provides sufficient evidence to survive summary judgment on this claim. The evidence in the record supporting this conclusion includes, but is not limited to, the following: (1) Franklin initiated the variable length research at Marley; (2) Franklin is characterized as "taking a 'hands-on' approach to his job" at Marley and being "actively involved in all phases of the business" while serving as Vice President of Sales and Marketing; (3) Franklin received a copy of the project sheet indicating that the research was terminated; (4) Franklin's request for engineering assistance resulted in the creation of a Value Analysis team to study the feasibility of Franklin's proposed invention, and such team included Franklin's personal secretary; (5) Franklin had access to Deters' work product; (6) Franklin's affidavit provided an equivocal denial that he saw Deters' work product; (7) Franklin was under a contractual duty not to use or reveal any technical information acquired while at Marley; (7) Franklin is listed as an inventor on the '895 patent; and (8) the variable length technology patented in '895 resembles the technology developed by Deters in 1980 in several significant respects. While this circumstantial evidence of misappropriation is weak, it is sufficient to survive summary judgment. *See generally Pioneer Hi–Bred Int'l v. Holden Foundation Seeds, Inc.,* 35 F.3d 1226, 31 USPQ2d 1385 (8th Cir.1994) (finding circumstantial evidence of misappropriation sufficient to support plaintiff's judgment).[7]

7. This issue will no doubt bear close re-examination in the context of a Rule 50 motion at

For the foregoing reasons, Petro's summary judgment motion will be denied as to Marley's misappropriation claim in Count III.

### Marley's Unfair Competition Claim

■ Petro seeks summary judgment on Marley's unfair competition claim. Both parties contend that Marley's unfair competition claim is properly analyzed under Iowa law as a claim for intentional interference with prospective business advantage. I will proceed accordingly.

■ To succeed on this claim, Marley must prove that: (1) it had a prospective business relationship with a third person; (2) Petro knew of the prospective relationship; (3) Petro intentionally and improperly interfered with the relationship in one or more particulars; (4) the interference caused either the third party or Marley not to enter into or to continue the relationship; and (5) the amount of damage. *See Willey v. Riley,* 541 N.W.2d 521, 526–28 (Iowa 1995); *Economy Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641, 651 (Iowa 1995). In its motion for summary judgment, Petro challenges only the sufficiency of the summary judgment record as to element three. To prove "improper" interference within the meaning of this tort, Marley must be able to show that the "sole or predominant purpose of [Petro's] conduct was to financially injure or destroy [Marley.]" *See Willey,* 541 N.W.2d at 527; *Economy Roofing,* 538 N.W.2d at 651–52; *cf. Farmers Co-op. Elevator, Inc. v. State Bank,* 236 N.W.2d 674, 679–82 (Iowa 1975) (dismissing claim because plaintiff failed to present evidence that defendant acted with a purpose to injure or destroy). If Petro acted for two or more purposes, the improper purpose must predominate in order to create liability. *Willey,* 541 N.W.2d at 527.

Marley alleges that FE Petro sales personnel contacted numerous customers and employees of Marley and told them that FE Petro had a patent on the variable length technology which it intended to enforce. Such contact, Marley argues, amounts to improper interference. Petro contends that many of these alleged contacts are unsupported by admissible evidence in the record, and that those contacts which are supported by the record were not improper—not motivated by a predominate purpose to financially injure Marley.

■ Marley alleges that FE Petro personnel improperly contacted numerous potential customers about Petro's intention to enforce its patent. In support of most of these allegations, however, Marley relies on its own answer to an interrogatory, which only lists those customers and distributors allegedly contacted by Petro, and on the deposition testimony of John Meyers, Marley's Vice President of Sales. Meyers testified in his deposition that he was aware of these contacts because he was told about them from the customers who were contacted. Such testimony is inadmissible hearsay which cannot be used to defeat a summary judgment motion. *See Scosche Industries, Inc. v. Visor Gear Inc.,* 121 F.3d 675, 681–82 (Fed.Cir.1997) (refusing to consider hearsay testimony concerning alleged acts of unfair competition when ruling on summary judgment motion); *Firemen's Fund Ins. Co. v. Thien,* 8 F.3d 1307, 1310 (8th Cir.1993) ("Inadmissible hearsay alone may not defeat a summary judgment motion."). Only two of Marley's allegations are supported by admissible evidence in the record. First, Meyers testified in his deposition that a Petro sales person, Jamie Leonard, told him in October 1996 that Leonard understood Marley to be in violation of Petro's patent. Second, the undisputed facts show that an independent sales representative for Petro, Peter Sokoloff, informed an engineer at Unocal, a potential customer of Marley's, that Petro had a patent on the variable length feature and that Petro would be enforcing the patent.

trial.

The mere existence of these contacts does not end my analysis. I must also decide whether there is evidence that these contacts were "improper." A company has a right to inform competitors and customers of its patent rights, and such dialogue is generally not considered improper. *See Scosche Industries, Inc. v. Visor Gear Inc.*, 121 F.3d 675, 680 (Fed. Cir.1997) and cases cited therein ("There is nothing improper about a patentee's attempting to enforce its rights under the patent by advising potential infringers of its good faith belief that a particular product infringes."). Such a dialogue may be improper, however, if Petro informed the customers or competitors that FE Petro had a patent, and threatened the customers or competitors with lawsuits to enforce the patent, before the patent was actually issued. *See Gardiner v. Gendel*, 727 F.Supp. 799, 805 (E.D.N.Y.1989), *aff'd by* 976 F.2d 746, 1992 WL 183561 (Fed.Cir. 1992) (concluding that plaintiffs engaged in unfair competition based upon the false and misleading threats of patent infringement sent to defendants' customers prior to the time that plaintiffs had acquired any enforceable rights); *Mixing Equipment Co., Inc. v. Innova–Tech, Inc.*, 228 U.S.P.Q. 221 (E.D.Pa.1985) (noting that an intentional announcement that a device is covered by an unissued patent may be held to constitute unfair competition). Moreover, Petro's dialogue with Marley customers and distributors after the issuance of '895 patent may be found improper if Petro was acting in bad faith when it expressed the belief that Marley's products infringed the patent, *see Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 710 (Fed.Cir.1992) (noting that infringement notices have been enjoined when the patentee had no good faith belief in the validity of its patent); *cf. Bateman v. Ford Motor Company*, 302 F.2d 63, 67 (3d Cir.1962) (noting that courts issue injunctions against patent holders who circulate notices of infringement in bad faith); or if Petro made the threats without intending to file suit. *See Mallinckrodt*, 976 F.2d at

710; *see also Nesler v. Fisher and Company, Inc.*, 452 N.W.2d 191, 198 (Iowa 1990) (quoting Restatement (Second) of Torts § 767, cmt. c) ("A typical example of [improper motive] is the case in which the actor threatens the other's prospective customers with suit for the infringement of his patent and either does not believe in the merit of his claim or is determined not to risk an unfavorable judgment and to rely for protection upon the force of his threats and harassment.").

Marley makes four discernable arguments why Petro's contacts were improper. First, Marley suggests that FE Petro personnel threatened lawsuits against customers which Petro did not intend to pursue. This claim is not supported by admissible evidence in the record. Second, Marley contends that Petro could not have a good faith belief in the validity of the patent because Franklin knew that he converted or misappropriated the technology from Marley. This argument puts the cart before the horse. Until the resolution of this case, '895 patent warrants a presumption of validity. *See* 35 U.S.C.A. § 282. Thus, there is nothing "unfair" about asserting infringement, even if the patent is later found to be invalid. *See Informix Software, Inc. v. Oracle Corp.*, 927 F.Supp. 1283, 1287 (N.D.Cal.1996) (granting motion to dismiss unfair competition claim because merely asserting rights under trademark, which is presumed valid, is not actionable as unfair competition even if trademark is challenged as invalid in the same lawsuit). Third, Marley contends that the contacts were improper because some of the statements were allegedly made prior to the issuance of patent '895. This contention is not adequately supported by the record. Marley presents no evidence that Sokoloff told Unocal, Marley's potential customer, that Petro had a patent on the variable length feature which it intended to enforce prior to the issuance of the patent. Indeed, the only evidence in the record concerning the time-frame of this dialogue suggests it occurred in De-

cember 1996, after the issuance of the '895 patent. Moreover, the fact that a Petro representative suggested to a Marley executive at the October 1996 trade show that the patent had already been issued is not, without more, sufficient evidence of improper interference to survive summary judgment.

Marley's unfair competition claim therefore rests on its fourth and final allegation—Petro's actions were improper because its representatives made allegations of infringement before analyzing Marley's product in a manner sufficient to develop a good faith belief that the product was infringing the patent. Petro relied almost exclusively on its observations at the October 1996 trade show to support its belief that Marley's product was in violation of the patent. Indeed, it is undisputed that FE Petro personnel made claims of patent infringement before anyone at FE Petro had an opportunity to purchase and "tear down" Marley's product. Although patent-holders need not be absolutely confident that their patent is being infringed before they take appropriate steps to enforce it, whether Petro's observations were sufficient to establish a "good faith" belief of infringement is a matter for the jury to decide. This is especially true when the patent and the product have complicated internal structures that are not readily observable. *Compare, S. Bravo Sys. v. Containment Technologies Corp.*, 96 F.3d 1372, 1375 (Fed.Cir.1996) (finding infringement suit may have been brought without reasonable and competent inquiry under Rule 11 analysis where attorneys relied on patentee's opinion of infringement based merely on viewing competitor's model and literature at trade show), *with Accent Designs, Inc. v. Jan Jewelry Designs, Inc.*, 827 F.Supp. 957, 964–65 (S.D.N.Y.1993) (concluding that cease and desist letters sent to competitor's customers were not unfair competition after patent holder saw rings in catalogues and at trade show which apparently had patented V-shaped grooves).

In addition, the record contains non-contact-specific evidence buttressing Marley's contention that there is at least a fact dispute as to the existence of improper interference. For example, the record contains a series of memos from FE Petro's Vice President of Sales to its sales force, both before and after the issuance of the patent, in which the Vice President appears to encourage an aggressive, combative approach towards Marley and its telescoping pipe product. This series of memos culminates in a letter to the sales force in which the Vice President requests that the sales people step back from this aggressive approach. The letter reads: "Our position is not to take this to the market place any further than it already is. There should be no threatening comments to any user/distributor that they will be brought into this if they purchase the competitions product." The record also contains two letters from Marley's Vice President of Marketing to customers in which Marley responds to requests for assurances by promising to defend any suit brought by Petro against the customers for infringing '895 patent. Thus, viewing the record as a whole, I conclude that a reasonable jury may be able to find that some of the allegations of infringement were made without a good faith belief in their validity.

Similarly, I conclude that there is sufficient evidence of an intent to financially injure to survive summary judgement. In his deposition testimony, Sokoloff could not give a reason for mentioning to Unocal the '895 patent or Petro's intent to enforce it. Moreover, he was not sure whether he commented on Marley's ability to deliver its product in light of the patent controversy. These alleged comments made to customers and competitors can be found by a jury to have been made with at least a predominate purpose to financially injure Marley—to prevent Marley from making a sale. *See Economy Roofing*, 538 N.W.2d at 652 (finding sufficient evidence to create a jury question as to the existence of an

intent to financially harm the plaintiff). Accordingly, Petro's summary judgment motion as to the unfair competition claim will be denied.[8]

### Marley's Shop Right Claim

■ Petro seeks summary judgment on Marley's shop right claim alleged in Count VI, contending any rights obtained by Marley under the doctrine are superceded by the rights expressly provided for in Franklin's Technical Employee Agreement. I agree. *See Jamesbury Corp. v. Worcester Valve Co.*, 443 F.2d 205, 214 (1st Cir.1971) ("Where [inventive] rights are allocated by contract, the common law doctrine [of shop right] is superseded."); *Brown v. The L.V. Marks & Sons Co.*, 64 F.Supp. 352, 68 U.S.P.Q. 365, 368 (E.D.Ky. 1946) (concluding that there could be no claim for shop rights where the parties had an express agreement for the employee to assign the patent to the employer in exchange for royalties); *Deye v. Quality Engraving & Electrotype Co.*, 100 N.E.2d 310, 317–18 (Ohio 1950), *rev'd on other grounds*, 90 Ohio App. 324, 106 N.E.2d 584, *appeal dismissed*, 157 Ohio St. 514, 105 N.E.2d 873 (1952) (concluding that employer did not acquire shop right in an invention patented by the employee because they expressly contracted that the plaintiff was to receive a royalty for the assignment to them of his exclusive patent rights and "[a]n express agreement supercedes an implied right which would come into existence if the parties remained silent."). Thus, to the extent Marley acquires any right to the variable length technology from Franklin's work product while at Marley in the 1980s, such a right derives from the express employee agreement and not from the common law shop right doctrine.

Marley contends, however, that it may have a shop right to the variable length technology insofar as Deters, and not Franklin, developed the invention while working at Marley. Marley argues that the shop right cause of action should not be dismissed because the jury may conclude that Deters developed the technology while working at Marley without an express agreement to assign inventions to the company. In such a situation, Marley argues, the jury ought to be allowed to consider the applicability of the shop right doctrine. Not only is this argument inconsistent with Marley's complaint, in which Marley limited its shop right claim to Franklin's work product, but it also proposes a misuse of the doctrine.

■ The shop right doctrine has been described as follows: "[W]here a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a nonexclusive right to practice the invention." *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 188, 53 S.Ct. 554, 77 L.Ed. 1114 (1933). In other words, a shop right is a non-transferrable, non-exclusive, royalty-free right permitting the employer to use an invention developed by an employee on the job. *See* Paul M. Rivard, *Protection of Business Investments in Human Capital: Shop Right and Related Doctrines*, 79 J.Pat. & Trademark Off. Soc'y, 753, 757 (1997). Thus, the right received under the shop right doctrine is very narrow. Indeed, a shop right does not grant the employer any ownership interest in the invention or the patent, but rather, merely operates as an affirmative defense to a claim of patent infringement brought by the employee/inventor. *See Kurtzon v. Sterling Industries, Inc.*, 228 F.Supp. 696, 697 (E.D.Pa.1964) (noting that a shop right holder has no right to sue for patent infringement nor join with the licensor in bringing an infringement action); *see also McElmurry v. Arkansas Power and Light Co.*, 995 F.2d 1576 (Fed.Cir.1993) (outlin-

---

**8.** This issue, like the misappropriation issue, will no doubt bear close re-examination in the context of a Rule 50 motion at trial.

ing modern approach to using shop right as a defense to patent infringement cause of action); *Aetna–Standard Engineering Co. v. Rowland,* 343 Pa.Super. 64, 493 A.2d 1375, 1382 (1985) (noting that while employer has no right to employee's patent interest, under shop right employer was entitled to the royalty-free, non-exclusive use of the invention). I conclude, therefore, that the shop right doctrine cannot be the basis for an affirmative claim for relief. Accordingly, Count VI of Marley's complaint will be dismissed.[9]

### Marley's Specific Performance Claim

 In count II of its complaint, Marley claims direct ownership interest in the '895 patent pursuant to technical employee agreements executed by Franklin and Marley in 1972 and 1980. Those agreements read in pertinent part:

> The Employee agrees to disclose and assign to the Company all inventions made by the Employee during the period of his employment or disclosed and assigned within six (6) months after the termination of his employment, either solely or jointly with others, whether or not such inventions involve the use of the Company's time, materials or facilities, provided such inventions relate to *any subject matter with which the Employee's work with the Company is or may be concerned,* or related to the business carried on or a business contemplated (and disclosed to the Employee) by the Company. (emphasis added)

Marley seeks specific performance of this provision—an order requiring Franklin to assign any patent rights in '895 to Marley.

Petro moves for summary judgment on this claim, contending that Marley has failed to present any evidence that Franklin "made" the variable length invention while at Marley. I agree. The record is void of any evidence that Franklin participated in the creation of the 1980 technical drawings or the working model. Indeed,

it is undisputed that Deters made two of the technical drawings and the working model, and that Allender made the third technical drawing. There is no testimony or evidence that Franklin assisted those creators in any aspect other than to make the initial request for engineering action. Merely proposing an idea, without offering any assistance in turning the idea into reality, does not amount to making an invention. *See Garrett Corp. v. United States,* 190 Ct.Cl. 858, 422 F.2d 874, 880 (1970) ("Joint invention connotes collaboration of effort to produce a complete and operative invention. One who merely suggests an idea of a result to be accomplished, rather than a means of accomplishing it, is not a joint inventor."); *Lamb–Weston, Inc. v. McCain Foods, Inc.,* 818 F.Supp. 1376 (E.D.Wash.1993), *aff'd in part, vacated in part,* 78 F.3d 540 (Fed. Cir.1996) (vacating unrelated discussion of unenforceability of patent) ("To be a joint inventor, one must do more than merely suggest a desirable result without the means of accomplishing it."); *Huck Manufacturing Co. v. Textron, Inc.,* 187 U.S.P.Q. 388, 407 (E.D.Mich.1975) ("The suggestion or conception of an idea or appreciation of a result to be accomplished, rather than the means of accomplishing it, particularly when the means constitute an essential part of the invention, does not constitute joint or sole inventorship."). Accordingly, Petro's summary judgment motion will be granted as to Count II.

### FE Petro's Abuse of Process Claim

 FE Petro claims that Marley's distribution of its complaint and accompanying letter to third parties constitutes abuse of process. Marley seeks summary judgment on FE Petro's abuse of process claim, contending Marley's actions failed to satisfy the elements of the claim. To prevail on an abuse of process claim, a party must show that an opposing party: (1) used the legal process (whether civil or

---

**9.** Nothing in this opinion should be read as precluding Marley from using the shop right doctrine as an affirmative defense to FE Petro's patent infringement cause of action.

criminal), (2) in an improper or unauthorized manner, (3) causing harm to the party. *See Fuller v. Local Union No. 106,* 567 N.W.2d 419, 421–22 (Iowa 1997).

A party must first show the use of the legal process. The Iowa Supreme Court has not specifically outlined the definition of "legal process" as it relates to the first element. *See Fuller,* 567 N.W.2d at 422. Iowa courts, however, have drawn upon varied legal authority to explain the meaning of the phrase. For example, a legal process constitutes one which " 'emanates from or rests upon legal authority,' " and " 'the papers issued by a court to bring a party or property within its jurisdiction.' " *Id.* (quoting respectively 1 Am.Jur.2d *Abuse of Process* § 2, at 411 (1994), and *Chemawa Country Golf, Inc. v. Wnuk,* 9 Mass.App.Ct. 506, 402 N.E.2d 1069, 1071 (1980)). The Iowa Supreme Court rejected one court's holding that threatening criminal charges to encourage settlement in a civil suit constituted abuse of process. *See id.* (discussing *Standing Comm. on Discipline v. Ross,* 735 F.2d 1168, 1172 (9th Cir.1984)). The *Fuller* court found this case to be in the minority and disagreed with its broad definition of legal process. *See Fuller,* 567 N.W.2d at 422.

FE Petro contends that the complaint distribution to third parties, not the actual filing, constitutes abuse of process. This argument conflicts with the Iowa Supreme Court's interpretation of the legal process element. There is a difference between using a legal document for non-legal purposes, which is what Marley did, and using the actual legal process for non-legal purposes. Distribution of the complaint, even if improper, fails to qualify as legal process. I, therefore, conclude as a matter of law that Marley is entitled to summary judgment on FE Petro's abuse of process claim.

### FE Petro's Lanham Act Claim

FE Petro argues that the product statements contained in Marley's complaint and accompanying letter, and their distribution to third parties, violates the Lanham Act's prohibition of false or misleading advertising. Marley moves for summary judgment on FE Petro's Lanham Act claim, arguing the Lanham Act is inapplicable to Marley's distribution of its complaint. The Lanham Act generally protects against false or misleading advertising. *See United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1179 (8th Cir.1998). To prevail on a claim for false advertising or promotion under the Lanham Act, § 43(a) requires a party to show that the opposing party "in connection with any goods or services *** uses in commerce any *** false or misleading description *** or misleading representation of fact, which *** in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities *** of his or her or another person's goods *** or commercial activities" which causes a person to believe that "he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1)(B). This provision generally can be broken down into a variation of the following five elements: (1) a false statement of fact, in connection with a party's own or another's product, that has the capacity to deceive; (2) the statement affects interstate commerce; (3) the statement was made in connection with commercial advertising or promotion; (4) the statement is material; and (5) the statement is likely to cause injury. *See United Indus. Corp.,* 140 F.3d at 1180; *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv., Inc.,* 911 F.2d 242, 244 (9th Cir.1990).

Marley's complaint and accompanying letter do not represent traditional forms of advertising or promotion commonly at issue in Lanham Act litigation. Actual product references in the complaint and letter are few; most of Marley's complaint pertains to FE Petro's business practices, the '895 patent and its underlying technology, and Franklin's professional history. On occasion, Marley does refer to its own products. For example, Marley claims its product is "first-quality, first-performance"

and describes one product as a "variable length pipe assembl[y]." Marley also informed its customers of its new Quick–Set pump and that was available for shipment. FE Petro has failed, however, to create a genuine issue of material fact as to the falsity or misleading nature of these product statements.

 To satisfy element one, a plaintiff must show that the defendant's statements relating to products are either literally false or are misleading and have a tendency to deceive consumers. *See United Indus. Corp.*, 140 F.3d at 1180. Mere puffing is not actionable if it is highly subjective. *See id.* Statements constitute puffing if they exaggerate, bluster, or boast, but upon which "no reasonable buyer would rely" when purchasing a product. *Id.* Most product statements in advertising fall into the puffing category. *See id.*

 Marley's complaint and the statements therein regarding its Red Jacket pump products have not been shown to be literally false as a factual matter. As previously discussed, Marley's few product statements either describe its products and their availability or boast about quality. FE Petro failed to offer any evidence of the inaccuracy or falsity of Marley's product descriptions or availability. The statements like "first-quality, first-performance products" boast about Marley's products and most likely constitute inactionable puffing. FE Petro may show, however, that these statements, or others, have a tendency to deceive the consumers. FE Petro bears the burden of proving confusion among consumers due to specific product statements. *See id.* at 1183. Confusion must be shown by providing reliable consumer or market research data. *See id.* A party cannot satisfy this burden by " 'arguing how customers *could* react; it must show how customers *actually* do react.' " *Id.* (emphasis in original) (quoting *Sandoz Pharm. Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 228–29 (3d Cir. 1990)). In other words, " '[i]t is not for the judge to determine, based solely upon his

or her intuitive reaction, whether the advertisement is deceptive.' " *Id.* (quoting *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir.1992)). The only way FE Petro can avoid producing reliable research showing consumer confusion is to show that Marley made statements with bad faith or with the intent to deceive consumers. *See id.*

FE Petro fails to meet its burden to satisfy element one on both accounts. FE Petro supplies the court with data showing a decline in sales growth in 1997. This data, however, is insufficient to show consumer confusion. FE Petro's sales growth decline could be attributed to any number of factors. Most importantly, this evidence fails to represent consumer attitudes of any kind. FE Petro fails to offer any evidence of consumer confusion, and the record lacks any evidence of consumer research data. FE Petro also fails to offer evidence of bad faith or intentional deception on Marley's behalf. FE Petro may believe Marley acted in bad faith. A belief is insufficient, however, to survive a motion for summary judgment. I will, therefore, grant Marley's motion for summary judgment on FE Petro's Lanham Act claim due to FE Petro's failure to produce evidence of a genuine issue material fact regarding element one.

## RULINGS AND ORDERS

FE Petro, Inc. and Charles Franklin's motion for partial summary judgment is **GRANTED** as to Counts I, II, and VI, and **DENIED** as to Counts III and V of The *Marley Company's complaint*. **IT IS ORDERED** that Counts I, II, and VI of The Marley Company's complaint be dismissed.

The Marley Company's motion for partial summary judgment is **GRANTED** as to Counterclaim II and V of FE Petro, Inc. and Charles Franklin's answer. *IT IS ORDERED* that Counterclaims II and V be dismissed.

The court's ruling on Marley's summary judgment motion concerning the defamation claims, Counterclaims III and IV, will be issued upon.